UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Sebastian Funez Mene, )<br>)<br>Petitioner, )<br>)<br>v. )<br>)<br>Kaja Funez Sokola, )<br>)<br>Respondent, )<br>) | Case No. 22-cv-10333 (KPF) |

**<u>VERIFIED RESPONSE TO PETITION FOR THE RETURN OF A CHILD</u>**

Respondent, Kaja Funez Sokola, through her undersigned attorneys, Green Kaminer Min & Rockmore LLP, responds to the Petition for the Return of a Child as follows:

1. Respondent states that the statement in Paragraph 1 purports to be a request for relief to which no response is necessary at this time. To the extent that a response is necessary, Respondent denies the allegations and opposed the requested relief.

2. Respondent admits to the allegations in Paragraph 2.

3. Respondent admits to the allegations in Paragraph 3. However, Petitioner was born and lived most of his life in France but upon information and belief he changed his citizenship to hide from crimes he committed in France.

4. Respondent denies the allegations in Paragraph 4 to the extent that there were several months in which the parties lived physically apart in late 2020 and early 2021.

5. Respondent admits to the allegations in Paragraph 5.

6. Respondent denies knowledge and information sufficient to form a belief as to the allegations in Paragraph 6.

1

7. Respondent denies knowledge and information sufficient to form a belief as to the allegations in Paragraph 7.

8. Respondent denies knowledge and information sufficient to form a belief as to the allegations in Paragraph 8.

9. Respondent denies knowledge and information sufficient to form a belief as to the allegations in Paragraph 9.

10. Respondent denies knowledge and information sufficient to form a belief as to the allegations in Paragraph 10.

11. Respondent admits to the allegations in Paragraph 11.

12. Respondent admits to the allegations in Paragraph 12.

13. Respondent neither admits nor denies the allegations in Paragraph 13 since Respondent's address has been kept confidential during the proceedings in Poland and New York State out of her fear of Petitioner.

14. Respondent admits to the allegations in Paragraph 14 and as explained previously and below, it is because Respondent is afraid of Petitioner due to this history of abuse. Petitioner had also previously hired private detectives to follow Respondent and installed GPS tracking in her phone.

15. Respondent admits to the allegations in Paragraph 15.

16. Respondent admits to the allegations in Paragraph 16 except as to those months in late 2020 and early 2021 when the parties did not reside together.

17. Respondent admits to the allegations in Paragraph 17. In addition, Respondent holds a Master's degree in Clinical Psychology from the University of Social Science, SWPS and is a certified addiction and co-dependence psychotherapist, and Gestalt psychotherapist.

18. Respondent admits to the allegations in Paragraph 18 to the extent that she is unable to work in the United States, but she is developing projects and is able to work remotely in Poland. However, Respondent is waiting to be granted a work permit to work in the U.S. shortly.

19. Respondent denies the allegations in Paragraph 19 to the extent that Respondent and BFS are lawfully present in the United States, currently in proceedings to attain asylum protection.

20. Respondent denies the allegations in Paragraph 20 to the extent that Respondent and BFS had to often escape the shared residence due to abuse.

21. Respondent states that the allegation in Paragraph 21 constitutes a legal conclusion as to which no response is necessary or appropriate.

22. Respondent admits to the allegations in Paragraph 22.

23. Respondent admits to the allegations in Paragraph 23.

24. Respondent admits to the allegations in Paragraph 24.

25. Respondent admits to the allegations in Paragraph 25 to the extent that she does have family in Poland who she was rarely able to visit as a result of Petitioner's coercive control.

26. Respondent admits to the allegations in Paragraph 26 but she has several close friends in the U.S.

27. Respondent admits to the allegations in Paragraph 27 to the extent that the parties hired a full-time nanny in April 2021. Prior to April 2021, they had intermittent babysitters and Respondent took care of the child almost exclusively.

28. Respondent admits to the allegations in Paragraph 28.

29. Respondent denies knowledge and information sufficient to form a belief as to the allegations in Paragraph 29.  Petitioner informed Respondent of this possible registration which she opposed.

30. Respondent denies the allegations in Paragraph 30.

31. Respondent denies the allegations in Paragraph 31.  BFS has health insurance and a pediatrician in the United States.

32. Respondent denies knowledge and information sufficient to form a belief as to the allegations in Paragraph 32.

33. Respondent states that the allegation in Paragraph 33 constitutes a legal conclusion as to which no response is necessary or appropriate.  Respondent admits the child is currently located within this Court's jurisdiction.

34. Respondent denies the allegations in Paragraph 34 to the extent that Respondent escaped Poland because of Petitioner's abuse.

35. Respondent admits to the allegations in Paragraph 35.

36. Respondent admits to the allegations in Paragraph 36.

37. Respondent denies the allegations in Paragraph 37.

38. Respondent denies the allegations in Paragraph 38 to the extent that Respondent never intended to return to Poland.

39. Respondent admits to the allegations in Paragraph 39.

40. Respondent admits to the allegations in Paragraph 40.

41. Respondent denies knowledge and information sufficient to form a belief as to the allegations in Paragraph 41 but admits that she was breast feeding BFS.

42. Respondent denies the allegations in Paragraph 42 to the extent that Respondent never planned to return to Poland. Respondent admits that Petitioner was harassing her, often calling or messaging dozens of times per day.

43. Respondent admits to the allegations in Paragraph 43 but Petitioner's behavior included threats and harassment.

44. Respondent admits to the allegations in Paragraph 44.

45. Respondent admits to the allegations in Paragraph 45 to the extent that Respondent did tell Petitioner this information out of fear.

46. Respondent admits to the allegations in Paragraph 46 to the extent that Petitioner engaged in constant threats and harassment.

47. Respondent admits to the allegations in Paragraph 47 and adds that Petitioner was continuing to harass and threaten Respondent.

48. Respondent denies knowledge and information sufficient to form a belief as to the allegations in Paragraph 48 but admits that he did not express consent to a permanent relocation to the U.S. to Respondent but did consent to the travel to the U.S.

49. Respondent denies knowledge and information sufficient to form a belief as to the allegations in Paragraph 49.

50. Respondent denies knowledge and information sufficient to form a belief as to the allegations in Paragraph 50.

51. Respondent denies knowledge and information sufficient to form a belief as to the allegations in Paragraph 51.

52. Respondent denies the allegations in Paragraph 52 to the extent that Petitioner was never clear with what he filed and was simply threatening Respondent about being in trouble.

53. Respondent denies the allegations in Paragraph 53 to the extent that Respondent did not receive any Convention Application.

54. Respondent admits to the allegations in Paragraph 54.

55. Respondent admits to the allegations in Paragraph 55.

56. Respondent states that the allegation in Paragraph 56 constitutes a legal conclusion and a request for relief as to which no response is necessary or appropriate.

57. Respondent states that the allegation in Paragraph 57 constitutes a legal conclusion as to which no response is necessary or appropriate.

58. Respondent states that the allegation in Paragraph 58 constitutes a legal conclusion as to which no response is necessary or appropriate.

59. Respondent denies knowledge and information sufficient to form a belief as to the allegations in Paragraph 59 but admits that she is not aware of any such proceedings.

60. Respondent denies knowledge and information sufficient to form a belief as to the allegations in Paragraph 60 but admits that she is not aware of any such proceedings.

61. Respondent denies knowledge and information sufficient to form a belief as to the allegations in Paragraph 61 but admits that she is not aware of any such proceedings.

62. Respondent admits to the allegations in Paragraph 62.

63. Respondent admits to the allegations in Paragraph 63.

64. Respondent states that the allegation in Paragraph 64 constitutes a legal conclusion as to which no response is necessary or appropriate.

65. Respondent states that the allegation in Paragraph 65 constitutes a legal conclusion as to which no response is necessary or appropriate.

66. Respondent reiterates and restates her responses to Paragraphs 1-65.

67. Respondent states that the allegation in Paragraph 67 constitutes a legal conclusion as to which no response is necessary or appropriate.

68. Respondent states that the allegation in Paragraph 68 constitutes a legal conclusion as to which no response is necessary or appropriate.

69. Respondent states that the allegation in Paragraph 69 constitutes a legal conclusion as to which no response is necessary or appropriate.

70. Respondent states that the allegation in Paragraph 70 constitutes a legal conclusion as to which no response is necessary or appropriate.

71. Respondent states that the allegation in Paragraph 71 constitutes a legal conclusion as to which no response is necessary or appropriate.

72. Respondent requests that the relief requested in the wherefore clause of the petition be denied, except to the extent that any final order issued would be dismissing the petition.

## **AFFIRMATIVE DEFENSES**

73. Respondent asserts the following defenses based upon her present knowledge of the circumstances giving rise to the Petition. Respondent reserves the right to supplement her defenses upon completion of discovery or upon learning of any additional facts that are not presently known or reasonably knowable.

## **FIRST DEFENSE**

74. To the extent that any specific allegation in the Petition is not addressed, that allegation is hereby denied.

**SECOND DEFENSE**

75. The Petition should be dismissed pursuant to Art. 13(b) of the Hague Convention because there is a grave risk that the Child will suffer emotional, physical, or psychological harm, or otherwise be placed in an intolerable situation, if returned.

76. A Court should "refuse to order the repatriation of a child if 'there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.'" *Blondin v. Dubois*, 238 F.3d 153, 156 (2d Cir. 2001) (quoting Hague Convention, art. 13(b)). As defined by the Second Circuit, grave risk exists in "situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation" *Id*. at 162 *(quoting Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996)).

77. It is well settled in the Second Circuit that "evidence of prior spousal abuse, [even] though not directed at the child, can support the grave risk of harm defense, as could a showing of the child's exposure to such abuse." *Davies v. Davies*, 717 F. App'x 43, 48 (2d Cir. 2017) (citation omitted); *accord Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014); *Souratgar* v. *Lee*, 720 F.3d 96, 104 (2d Cir. 2013).

78. To establish risk to a child, it is not necessary to prove that a child has himself been abused in the past, nor that any future abuse would be physical in nature. *See Baran v. Beaty*, 526 F.3d 1340, 1346 (11th Cir. 2008) (stating that "[t]o deny return, the district court was not required to find [the child] had previously been physically or psychologically harmed[.]"). Rather, "grave risk of psychological harm" to a child from "witnessing the abuse of his mother"—even where the child had not previously witnessed the abuse—can be "enough to establish the applicability of the [grave risk] defense." *Mohácsi v. Rippa*, 346 F.Supp.3d 295, 322 (E.D.N.Y. 2018).

79. Courts have recognized the exposure to domestic violence as a sufficient risk to preclude the child's return under the Convention. In *Walsh v. Walsh*, 221 F.3d 204, 219–21 (1st Cir. 2000), a case involving domestic violence, the First Circuit found that the petitioner had an uncontrollably violent temper; that social science literature establishes that serial spousal abusers are also likely to be child abusers; and that children were at increased risk of physical and psychological injury themselves when they are in contact with a spousal abuser. The First Circuit then reversed the lower court and found that the grave risk exception should have been applied and the petition denied.

80. Similarly, in *Simcox v. Simcox,* 511 F.3d 594 (6th Cir. 2007), the Sixth Circuit reversed the lower court and found that the grave risk exception applied where the children witnessed the petitioner abuse the respondent. The Sixth Circuit found that the "'Convention's purposes [would] not . . . be furthered by forcing the return of children who were the direct or indirect victims of domestic violence.'" Additionally, in *Tsarbopoulos v. Tsarbopoulos*, 176 F. Supp. 2d 1045, 1057 (E.D. Wash. 2001) the district court, after finding grave risk established, held that spousal abuse was a factor to consider in determining whether grave risk applies because of the potential that the abuser will also abuse the child.

81. Petitioner has engaged in a years long pattern of Intimate Partner Violence ("IPV") and coercive control. The parties were married in 2015 when Respondent was 29 years old and Petitioner 42 years old. Petitioner has worked to isolate Respondent from work, friends and family so that he can assert full control over her life and make her dependent on him. Even for their wedding day, Petitioner forbade Respondent's parents from attending the wedding and has since not allowed her to visit her parents by herself.

82. The Petitioner began to reveal his explosive temperament shortly after the parties' wedding. There were more and more arguments at home, during which the Petitioner behaved aggressively and insulted the Respondent. One night, he threw her family out of their apartment onto the streets of Warsaw following an argument.

83. As the Respondent did not have any profitable employment immediately after getting married, the Petitioner declared that he would support the family and that the Respondent could use the common property of the parties. However, this became a reason to insult the Respondent when she bought something, and even cut her off from any means of subsistence without warning. During such outbursts, the Petitioner persuaded the Respondent that she was mentally ill and was useless.

84. The Respondent, intending to achieve financial independence form the Petitioner, started looking for a job. The Petitioner engaged in a course of inhibiting her, undermining her self-esteem, saying such things as that without him the Respondent means nothing that she is "empty minded" and is an "empty idiot". When the Respondent started working with television (the respondent appeared as an expert in the Polish programs "Dzień dobry TVN" and "Pytanie na śniadanie"), she heard that she only wasted money on gasoline and could "wipe her ass" with such pennies. When in 2019 the Respondent was given the opportunity to create a rehabilitation center and co-create a psychological online platform, the Petitioner was furious that the Respondent devoted time to work which, in his opinion, should be devoted to him and the child. He said then that they would throw her out of this job anyway, because she was "stupid as a shoe" and threatened divorce if she would accept the offer. Throughout the marriage, Respondent has always wanted to work and support herself, and Petitioner has consistently tried blocking her efforts. Petitioner engaged in an argument with her boss and became physical during arguments about her profession.

85. The Petitioner also gradually tried to completely cut the Respondent off from her family and friends. Twice, the Petitioner "kicked out" the Respondent's family who came to visit her. When the Respondent wanted to go to the family with her husband, he booked a hotel for them, because staying in the Respondent's family home was unthinkable for him, and when she wanted to go alone, he insulted her that she was wasting money on fuel. The Petitioner did not want the Respondent's family to have any contact with the minor. The Petitioner was also morbidly jealous when the Respondent wished to leave the house, and either would not allow her to do so, or had instigated arguments upon her return.

86. Over time, the Petitioner's aggression ceased to be only verbal, and turned into physical. During such outbursts, the Petitioner repeatedly jerked the Respondent, kicked her legs, twisted her arms, put clenched fists to her face showing that he could hit her at any moment. When, during one of the outbursts, the Respondent wanted to call the police, the Petitioner yanked the telephone from the Respondent's hands and smashed it on the floor. During another outburst, the Petitioner twisted his Respondent's hand and, spitting in her face, threatened that, if she provoked him again, he would throw her down the stairs. In 2018 in a fit of rage, after Respondent brought Petitioner a piece of apple pie on a plate, he threw the plate towards her, which smashed against the wall, after he said Respondent did not respect his work.

87. With the passage of time, it was enough to make the Petitioner become furious and take advantage of the Respondent. During one such argument, approximately five years ago, the Petitioner threw two French bulldog puppies against the wall, which the parties had purchased not long before. The fact that the puppies were chewing on the shoes infuriated the Petitioner so much that he nearly killed them. Respondent rushed them to the vet to address their breathing problems

from the throat damage. The vet, obviously attune to the violent context, urged her to call the police, which she did not do because she was afraid of Petitioner.

88. The Petitioner's violence did not stop during the period when the Respondent was pregnant. In 2019, while she was seven months pregnant, Petitioner yelled at Respondent for not feeding the cats and forcefully twisted her arm while holding his fist against her face. While he held Respondent in a deadlock, he screamed, "try to provoke me and see how it ends." In that moment, Respondent was terrified she would miscarry. Screams and insults were on the agenda and many times the Petitioner snatched the crying Child from the Respondent's hands, threatening to take her son and leave her with nothing. Unfortunately, the Child was witness to the arguments, screams of the Petitioner, tugging of the Respondent and threats made against her by the Petitioner. The Child was then very scared and cried and could not be calmed down in any way.

89. There have been approximately six instances of physical abuse throughout the parties' marriage. Several people, such as Respondent's doctors, co-workers, friends and family know about the physical abuse after seeing marks and bruises on her body. Respondent has been too scared to call the police because she was afraid that this would cause more problems. However, she contacted womens' support organizations in search of help.

90. Once, Petitioner became enraged at the parties' nanny, punched his fist into the table beside her and screamed that she does not have the right to speak unless he allows it, and she must listen while he is speaking. In front of the Child, Petitioner snatched a feeding spoon from her hands, prevented her from approaching the Child, insulted her and finally made her run away from the house crying. He kept telling her that he was her "master" and that she was to do what he told her to do, not letting her speak without permission and the like.

91. After the nanny ran away crying, Respondent reprimanded Petitioner for treating her that way, and, in response, he gripped Respondent's arms and shook her violently, stating that she must listen to him because he is the man of the house, and during which he threatened to beat her. Terrified, Respondent then ran away with the Child to her friend's home, afraid that Petitioner would harm her or the Child. Petitioner then blocked her access to their bank account, exerting financial control to force her into compliance. Around that time, Respondent began speaking to a divorce attorney but did not go forward with the divorce process because Petitioner promised her that he would change. Petitioner hired a lawyer, who called Respondent multiple times a day to pressure me to return to our home.

92. The Petitioner also showed aggression directly towards the Child, shouted at him, pushed him, and after some time the Respondent noticed that the Child was beginning to behave nervously in the presence of the Petitioner. While Respondent has borne the brunt of Petitioner's abuse, she has become increasingly worried that Petitioner could harm someone else, especially their Child. In one such moment, Petitioner was playing with the Child when he abruptly turned violent. He began screaming and aggressively shaking the Child, and Respondent heard him cry from fear. She tried saving him from Petitioner's grip, but he tore the Child away. On a separate occasion, while at the beach, it began to rain and Petitioner became upset and ripped the Child from Respondent's arms before shoving her to the ground.

93. The Respondent was afraid to talk about domestic violence for a long time and report it to the relevant services. The reason for fear was the potential reaction of her husband, who had previously had problems with the justice system. As the Respondent learned from Petitioner telling her, only a few years after the wedding, the Petitioner served a prison sentence in San Francisco, approximately ten years ago, for harassing his ex-girlfriend, which he had completed

in a French prison due to deportation from the U.S.. The Respondent also learned from her husband's cousin that in France, her husband was also serving another prison sentence for financial fraud. The Respondent does not know the details, because Petitioner did not tell her about these events. She only learned of these arrests three years into our marriage after Petitioner's cousin, Salvador Santiago ("Santiago"), urged him to tell me. However, she is aware that he cannot use his French passport, and she has never been able to travel by air with him-likely as a result of these incidents. The Respondent also feared what her and her family's financial situation would be if she openly opposed her husband. The parties bought the house for a loan which was guaranteed by the Respondent's parents with their own assets. The Respondent was afraid that the Petitioner would cause trouble for her family and that she would be left homeless, what have been repeated by the Petitioner on every argument.

94. Upon information and belief, Petitioner was institutionalized when he was 27 years old after being determined a suicide risk. Petitioner has refused to be in therapy since, leaving his underlying issues unaddressed and unmitigated. He has struggled to maintain work and personal relationships because of his anger issues. Petitioner's income and work have always been unstable as he has had repeated conflict with his coworkers. Petitioner told me that he filed a lawsuit against IT developers with whom he was working. He has additionally filed cases against the owner of our apartment, the owner of our house and the bank that gave us a mortgage. Furthermore, we have received multiple complaints from neighbors regarding Petitioner's screaming. At one point, Petitioner was screaming so loudly at me that men working on our neighbors' house asked our neighbors' if they should call the police because they were so disturbed by what they were hearing.

95. During the months leading up to my departure for the United States, Petitioner would intimidate me physically daily and constantly barrage me with verbal assaults, calling me a

"whore" and an "idiot," and told me repeatedly that I would never succeed and threatening to block me from going to the United States with our son.

96. Ultimately, the Respondent reported domestic violence via the Polish "Blue Line", where she received support and guidance as to what further steps needed to be taken. The Respondent started working with psychotherapists. After several years of the relationship with the Petitioner, she was afraid, depressed and lacked self-esteem. The Petitioner repeatedly threatened to throw the Respondent out on the pavement, to take her son away and to hurt her if she opposed him. Due to the constant threats and aggression of the Petitioner, Respondent and the Child escaped in January this year to the United States, where she is currently staying. She is afraid to return to Poland, because she is afraid of the Petitioner. The Petitioner has explicitly stated that when the Respondent returns, she will no longer see the Child and has even threatened that one day the Respondent may simply disappear. The Respondent knows that she will be safe in the U.S. because the Petitioner cannot enter due to his past imprisonment. The Respondent has filed for asylum with the Child as victims of violence and for permanent shelter with her son in the U.S.

97. The Child of the parties is currently 3 years old. Respondent is the only parent who gives the Child a sense of warmth and security. The Child is given telephone contact with the Petitioner, but it has become necessary, however, to set the time limits for this contact. Regardless of what the Child is doing at that time and what is his daily rhythm, the Petitioner floods the Respondent with text messages and calls, demanding an immediate conversation with the Child, considering one missed call as preventing him from contacting the Child. The Respondent still feels persecuted, controlled and harassed by the Petitioner, since when the Respondent answers the call from the Petitioner, he uses this time not to talk to the Child, but to insult the Respondent, in the presence of the parties' Child. Since arriving in New York, Petitioner has become obsessive

15

about tracking Respondent's activities and if she does not respond to a message from Petitioner immediately, he will flood her with scores of messages across all platforms-Instagram, WhatsApp, Facebook and email. On one occasion, Petitioner contacted Respondent eighty times in one day.

98. Petitioner's abuse has continued and, in some ways, escalated since Respondent has been in the United States causing her even greater fear. Petitioner has engaged in a pattern of harassment and threats, including saying he was going to take their Child away from Respondent and put her in jail. Petitioner has threatened to conspire with the Defendants, Harvey Weinstein, Miramax, and Disney, in Respondents' pending legal action (*Sokola v. Weinstein*, et al.; Index No. 950250/2019), and leak false information to the press to ruin her reputation and potential for future employment. In new efforts to sabotage Respondent's professional options in New York in publishing and media, Petitioner has warned her that he will hire a public relations firm to destroy her reputation.

99. Petitioner has openly told Respondent that his behavior is not about the Child, but that it is an effort to control her and what she is doing. He has suggested that he is using or could use devices that would record all communications in her phone, saying that "he has is eyes on [her]," and that she would never know. Furthermore, he has told her that if she does not listen to him, she will disappear one day, and no one will find her while he will take care of the Child himself. Respondent took that as a direct threat on her life.

100. The Respondent applied to the District Court for Warsaw Praga in Warsaw for securing the Child's custody with Respondent. It should be emphasized once again that the Respondent was forced to flee from a home where she had been experiencing physical, mental and financial violence for years, and these incidents were witnessed by the Child, who was also a victim of his father's violence. The Child has strong and deep emotional relationship with the

Respondent, who gives him a sense of security and stability, and finally lives in a house where there is no constant screaming, tension and uncertainty. The Child is presently enrolled in "3k" in New York.

101. On or around April 13, 2022, the District Prosecutor's Office for Warsaw Praga South in Warsaw, Poland commenced an investigation regarding a crime under Article 207 § 1 of the Polish Criminal Code (abuse of the family member) with respect to acts committed by Petitioner against Respondent and the Child. Respondent, as an aggrieved party, was interviewed on August 31, 2022, by the Consular Section of the Polish Embassy in New York. Respondent expects that formal charges will be brought shortly.

102. It should also be noted that as part of the Court procedures, the Petitioner and his attorneys have tried to determine the Respondent's address. However, Respondent has not been obligated to divulge her location by any Court thus far in order to maintain her and the Child's safety.

103. Given how Petitioner has engaged in a prolonged, years-long pattern of domestic abuse, including verbal and psychological abuse, sexual abuse, and instances of physical abuse, it is clear that the Child would be at a grave risk of harm if returned.

## FIFTH DEFENSE

104. Respondent hereby reserves the right, upon completion of her investigation and discovery, to file additional defenses.

**WHEREFORE**, Respondent respectfully requests that Petitioner's Petition be denied in its entirety and for other and further relief as is just and proper.

Dated: January 6, 2023
      New York, New York

                                      Respectfully Submitted,

                                      */s/ Richard Min*
                                      Richard Min
                                      *Attorney for Respondent*
                                      Green Kaminer Min & Rockmore LLP
                                      420 Lexington Avenue, Ste. 2821
                                      New York, New York 10170
                                      (212) 681-6400

## **VERIFICATION**

      Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct. Executed on January 6, 2023.

_kaja (Jan 6, 2023 15:33 EST)_
_____
Kaja Funez Sokola

# 230106 Response to Petition

Final Audit Report                                          2023-01-06

| | |
|---|---|
| Created: | 2023-01-06 |
| By: | Richard Min (rmin@gkmrlaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAjMgY59ZgUN7ipz_8WV8ba6FbRdc84bA7 |

## "230106 Response to Petition" History

- Document created by Richard Min (rmin@gkmrlaw.com)
  2023-01-06 - 8:15:01 PM GMT

- Document emailed to sokolakaja@gmail.com for signature
  2023-01-06 - 8:16:00 PM GMT

- Email viewed by sokolakaja@gmail.com
  2023-01-06 - 8:33:04 PM GMT

- Signer sokolakaja@gmail.com entered name at signing as kaja sokola
  2023-01-06 - 8:33:52 PM GMT

- Document e-signed by kaja sokola (sokolakaja@gmail.com)
  Signature Date: 2023-01-06 - 8:33:54 PM GMT - Time Source: server

- Agreement completed.
  2023-01-06 - 8:33:54 PM GMT

Adobe Acrobat Sign