UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SEBASTIEN FUNEZ MENE,

                    Petitioner,

          -v.-

KAJA FUNEZ SOKOLA,

                    Respondent.

22 Civ. 10333 (KPF)

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

KATHERINE POLK FAILLA, District Judge:

Before the Court is the Verified Petition (the "Petition") of Petitioner

Sebastien Funez Mene ("Petitioner"), pursuant to the Hague Convention on the

Civil Aspects of International Child Abduction, Oct. 25, 1980, 1343 U.N.T.S. 49

(the "Hague Convention" or the "Convention"), as further implemented by the

International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001-

9011, against Respondent Kaja Funez Sokola ("Respondent").  The Petition

seeks the repatriation from the United States to Poland of the parties' only

child, a minor referred to herein as "BFS," who is alleged to have been

unlawfully removed from Poland by Respondent in early 2022.

Over the tortuous course of these Hague Convention proceedings, there

emerged incontrovertible evidence of Petitioner's severe, unrelenting

psychological and physical abuse of Respondent, often executed in the

presence of BFS.  Worse yet, these proceedings laid bare numerous instances

of Petitioner's psychological and, to a lesser degree, physical abuse of BFS

himself, as well as of other children and animals.  And, despite Petitioner's

repeated (and at times perjurious) disavowals of the same, evidence surfaced of

Petitioner's extensive criminal history in France and elsewhere, including

convictions stemming from years of stalking and harassment of former intimate

partners and their families; this criminal history betrays Petitioner's propensity

to disobey court mandates generally and protective orders in particular.

Ultimately, Petitioner has revealed himself to be an unreformed narcissist,

incapable of acknowledging, let alone appreciating, the consequences of his

actions, who has audaciously pursued (mostly groundless) legal actions against

Respondent in this and other courts in total disregard of his own misconduct.

Accordingly, and for the reasons stated herein, the Court denies the Petition,

finding that repatriation of BFS to Poland would expose the child to a grave

risk of harm pursuant to Article 13(b) of the Hague Convention.

## PROCEDURAL HISTORY[1]

Despite the Court's sensitivity to the Hague Convention's target of "six

weeks from the date of commencement of the proceedings" to resolve the case,

---

[1]    The facts set forth in this Opinion are drawn from the testimony and exhibits entered
into evidence at the bench trial in this matter that began on October 30, 2023 (*see*
October 30, 2023 Minute Entry), as well as the parties' pretrial and post-trial proposed
findings of fact and conclusions of law (Dkt. #86, 88, 147, 148).

For ease of reference, the Court refers to the various exhibits entered into evidence at
the trial as "Ex. P-[ ]," if offered by Petitioner, and "Ex. R-[ ]," if offered by Respondent.
The Court refers generally to the transcript of a particular day of the trial as "Oct. 30
Tr." for the October 30, 2023 transcript (Dkt. #99); "Oct. 31 Tr." for the October 31,
2023 transcript (Dkt. #101); "Nov. 1 Tr." for the November 1, 2023 transcript (Dkt.
#103); and "Nov. 2 Tr." for the November 2, 2023 transcript (Dkt. #105).  The Court
refers to individual lines of testimony within the full trial transcript as "Tr. [ ]:[ ]
(Testimony of [ ])."

The Court frequently references the sworn statements of each of the trial witnesses —
Petitioner Sebastien Funez Mene (Ex. P-301 ("Pet. Decl.")); Agnieska Pilarczyk (Ex. P-
302 ("A. Pilarczyk Aff.")); Paul Montana (Ex. P-303 ("P. Montana Aff.")); Tatenda Danielle
Madzivanyika (Ex. P-304 ("T.D. Madzivanyika Aff.")); and Maciej Dzierzawski (Ex. P-305

Hague Convention art. 11, the procedural history of this action is comparatively lengthy because the parties' conduct during pretrial proceedings and at trial ultimately necessitated the reopening of the record after trial. The Court details this history below.

## A.    The Filing of the Petition and the Conduct of Discovery

Petitioner filed the instant Petition against Respondent seeking the repatriation from the United States to Poland of "the parties' only minor child, to wit; BFS, age 3 and born xx/xx/2019 in Poland." on December 6, 2022. (Dkt. #1; Dkt. #7 (corrected)). Respondent filed a response to the Petition on January 6, 2023 (Dkt. #12), followed by an amended response on January 26, 2023 (Dkt. #18). The parties appeared for an initial pretrial conference on January 27, 2023. (*See* January 27, 2023 Minute Entry). On the same day, the Court issued a Case Management Plan and Scheduling Order, which anticipated that all discovery in this action would conclude on or before June 26, 2023. (Dkt. #19).

---

("M. Dzierzawski Aff.")), as well as Respondent Kaja Sokola (Ex. R-111 ("Resp. Decl.")); Jarmila Moderska (Ex. R-112 ("J. Moderska Aff.")); Bozena Patkowska Sokola (Ex. R-113 ("B.P. Sokola Aff.")); Ewa Sokola (Ex. R-114 ("E. Sokola Aff.")); Dr. Joan Rothchild Hardin (Ex. R-115 ("J.R. Hardin Aff.")); and Bozena Anna Janowska (Ex. R-116 ("B.A. Janowska Aff.")) — which statements were submitted in advance of, and entered as exhibits at, the trial. The Court also references the expert reports of Petitioner's expert Anna Lesiak-Grzywińska (Ex. P-293 ("A. Grzywińska Rep.")) and Respondent's expert witness Dr. Edward Fernandez (Ex. R-92 ("E. Fernandez Rep.")).

For ease of reference, the Court refers to Petitioner's Pretrial Proposed Findings of Fact and Conclusions of Law as "Pet. FFCL (Pre)" (Dkt. #86); to Petitioner's Post-Trial Proposed Findings of Fact and Conclusions of Law as "Pet. FFCL (Post)" (Dkt. #148); and to Respondent's Post-Trial Proposed Findings of Fact and Conclusions of Law as "Resp. FFCL" (Dkt. #147).

At the parties' request, the Court granted the first of many extensions on May 24, 2023. (*See* Dkt. #24-26 (extending deadline for completion of all discovery to July 10, 2023), 37-39 (to July 17, 2023), 55 (to October 5, 2023), 58-69 (to October 10, 2023)). In addition to their requests for extensions to the discovery schedule, the parties also sought Court intervention with respect to a number of discovery disputes. (*See, e.g.*, Dkt. #23 (Petitioner's May 24, 2023 request for a discovery conference); Dkt. #31 (Respondent's June 6, 2023 request for a discovery conference); Dkt. #48 (Respondent's August 22, 2023 request for a discovery conference)).

Also amidst discovery, on June 23, 2023, the Court referred this matter to Magistrate Judge Stewart D. Aaron for a settlement conference. (Dkt. #35). The parties convened before Judge Aaron on July 10, 2023, but were unsuccessful in resolving their dispute. (*See* July 10, 2023 Minute Entry). Thereafter, the parties were ordered to appear before this Court on July 20, 2023, to discuss next steps in the matter. (Dkt. #42). At the July 20, 2023 conference, the Court set the matter for trial on October 30, 2023. (*See* July 20, 2023 Minute Entry; Dkt. #43 (post-conference order), 49 (transcript)).

## B.    The Trial

In the lead-up to the October 30, 2023 trial, the parties submitted their respective witness lists (Dkt. #76 (Respondent's witness list), 78 (Petitioner's witness list)); exhibit lists (Dkt. #75 (Respondent's exhibit list), 82 (as amended), 79 (Petitioner's exhibit list)); and proposed pretrial findings of fact and conclusions of law (Dkt. #86 (Petitioner's proposed findings of fact and

conclusions of law), 88 (Respondent's proposed findings of fact and conclusions of law)).  The parties also submitted a proposed joint pretrial order.  (Dkt. #80).  The Court held a final pretrial conference on October 26, 2023.  (*See* October 26, 2023 Minute Entry).

The trial proceeded before the undersigned from October 30, 2023, through November 2, 2023.  (*See* October 30, 2023 Minute Entry; October 31, 2023 Minute Entry; November 1, 2023 Minute Entry; and November 2, 2023 Minute Entry).  The first witness called by Respondent was Respondent herself, who testified in person, followed by:

- Jarmila Moderska, Respondent's friend, who testified via videoconference;

- Bozena Patkowska Sokola, Respondent's mother, who testified via videoconference;

- Ewa Sokola, Respondent's sister, who testified via videoconference;

- Dr. Joan Rothchild Hardin, who treated Respondent during her relationship with Petitioner, and who testified in person; and

- Bozena Anna Janowska, Respondent's neighbor, who testified via videoconference.

(*See generally* Oct. 30 Tr.; Oct. 31 Tr.; Dkt. #76).

Petitioner thereafter called as witnesses:

- Petitioner himself, who testified via videoconference;

- Agnieska Pilarczyk, the owner of a Polish modeling agency, who testified via videoconference;

- Paul Montana, an entrepreneur and friend of Petitioner, who testified via videoconference;

- ▪ Tatenda Danielle Madzivanyika, who served as BFS's nanny between December 2020 and April 2021, and who testified via videoconference; and

- ▪ Maciej Dzierzawski, a financial advisor and friend of Petitioner, who testified via videoconference.

(*See* Oct. 31 Tr.; Nov. 1 Tr.; A. Pilarczyk Aff.; P. Montana Aff.; T.D. Madzivanyika Aff.; M. Dzierzawski Aff.).  The trial concluded on November 2, 2023, with the testimony of Anna Lesiak-Grzywińska, Petitioner's expert witness, and Michal Wochnik and Dr. Edward Fernandez, Respondent's expert witnesses.  (*See* Nov. 2 Tr.; November 2, 2023 Minute Entry).

In addition to witness testimony, the Court received exhibits, including evidence concerning Petitioner's 2012 conviction for stalking in the Superior Court of the State of California, City and County of San Francisco (the "2012 Conviction").  (*See generally* Ex. R-48, R-49).  Ultimately, developments in the California case took center stage in the instant matter, and are thus discussed in some detail here.

## C.    Post-Trial Developments and the Reopening of Discovery

On December 29, 2023, Petitioner advised the Court that the 2012 Conviction — which, in Petitioner's view, had played a "large role … in th[e] proceeding[s]," to his detriment — had been vacated *nunc pro tunc* by the California Superior Court.  (Dkt. #112).  In light of the vacatur, Petitioner sought a reopening of the proceedings in this case.  (*Id.*).  On January 5, 2024, the Court agreed to reopen the hearing, permitting the parties to conduct supplemental discovery "limited to the subjects of the vacatur of Petitioner's

California conviction as well as the facts underlying such conviction." (Dkt. #114).

During the supplemental discovery period that followed, on February 6, 2024, the Court received a letter from Respondent, which letter included a copy of a French court decision evidencing Petitioner's extensive criminal history, in that country and elsewhere, "including, but not limited to, a history of fraud, forging documents, abuse of a former romantic partner ... and escape from France against court orders." (Dkt. #120). The information contained in Respondent's letter, if accurate, suggested that Petitioner and his counsel had repeatedly lied to the Court and to Respondent over the course of the instant proceedings, including at trial. (Dkt. #123). The Court thereafter scheduled a show cause hearing to discuss Respondent's letter. (*Id.*).

On February 12, 2024, Petitioner filed a letter requesting leave "to move to voluntarily withdraw his pending Convention Petition, prior to entry of judgment, without admission(s), and without an award of counsel fees and/or costs to either party, but with prejudice to renew/refile." (Dkt #125). The Court denied Petitioner's request (Dkt. #127), and Petitioner promptly renewed it (Dkt. #128). At a hearing held on February 27, 2024, the Court denied Petitioner's renewed request. (*See* February 27, 2024 Minute Entry; Dkt. #131 (transcript)).[2] In denying the request, the Court explained:

---

[2]    Petitioner appealed the Court's denial of his request, which appeal was thereafter dismissed by the Second Circuit

> because the district court has not issued a final order as contemplated by 28 U.S.C. § 1291. Our jurisdiction is generally limited to final orders of the district court, and no exceptions apply

> I do appreciate that ... [P]etitioner is requesting [to terminate these proceedings], and I understand counsel's arguments about why it is unusual to have th[is] case go [forward] ... with [such] request [having been made].
>
> But as [Petitioner's] reticence today suggests, the impetus for this motion to withdraw is, in fact, [Petitioner's] concern that recent disclosures [regarding his criminal record and corresponding false statements to the Court] may harm [him] in this case. [This Court] could stand down, but [the Court] think[s] that would unfairly prejudice the [R]espondent. And [the Court] ... [does not] really believe [such] a dismissal [would genuinely be] "with prejudice" because [Petitioner] can shift gears and obtain comparable rel[ief] [*i.e.*, the return of BFS to Poland] through [alternative means].

(*Id.* at 42).  Also at that hearing, in an attempt to chart a path toward the conclusion of these proceedings, the Court asked the parties to submit a joint letter by May 30, 2024, indicating "whether they want[ed] to have oral argument, whether they want[ed] to have a hearing with witness testimony, or whether they just want[ed] to submit written submissions" to bring the post-trial proceedings before this Court to an end.  (*Id.* at 43).

On May 24, 2024, Petitioner filed a letter formally invoking his Fifth Amendment right against self-incrimination (*see* Dkt. #134), in response to Respondent's Fourth Request for Production of Documents ("Respondent's Fourth RFP"), dated February 6, 2024, which request sought documentation on

---

here.  *See Petrello* v. *White*, 533 F.3d 110, 113 (2d Cir. 2008).  We lack jurisdiction over the district court's denial of Appellant's motion to withdraw his petition.  *See Ibeto Petrochemical Indus. Ltd.* v. *M/T Beffen*, 475 F.3d 56, 62 (2d Cir. 2007).

(Dkt. #138 (mandate)).

Petitioner's 2012 Conviction and the other alleged French convictions that Respondent had uncovered in the aftermath of the trial (*see generally* Dkt. #133-1 (Respondent's Fourth RFP)).  On May 30, 2024, Respondent provided the Court with more documents, sourced from the French Judiciary, purporting to further substantiate Petitioner's criminal history in that country and elsewhere.  (*See generally* Dkt. #136).

### D.    The Court Closes the Record

Also on May 30, 2024, the parties submitted the requested joint letter setting forth their positions on whether they wanted "an oral argument, hearing with witnesses, or written submissions" to conclude these proceedings.  (Dkt. #137).  In that letter, the parties also raised various issues regarding the implications of Petitioner's invocation of his Fifth Amendment rights in response to Respondent's Fourth RFP and the admissibility of the documents that Respondent had sourced from the French Courts.  (*See generally id.*).

After careful consideration of the parties' positions, on June 6, 2024, the Court declared that "the hearing in this Hague Abduction Convention proceeding is now closed."  (Dkt. #139).  The Court accordingly ordered the parties to submit post-trial proposed findings of fact and conclusions of law by June 28, 2024, which submissions were to address, *inter alia*, "[t]he vacatur of Petitioner's 2012 San Francisco, California conviction"; "Petitioner's waiver or non-waiver of his Fifth Amendment rights in response to Respondent's Fourth RFP"; "[a]ny adverse inferences that this Court may draw [against] Petitioner"; and "[t]he admissibility of the various records of the French Judiciary proffered

by Respondent." (Dkt. #139).  On July 9, 2024, after requesting and receiving a brief extension of time (*see* Dkt. #141-142), the parties filed their respective post-trial proposed findings of fact and conclusions of law (Dkt. #147 (Respondent's post-trial proposed findings of fact and conclusions of law), 148 (Petitioner's post-trial proposed findings of fact and conclusions of law)), at which point the Court set about resolving the Petition.

Since the June 6, 2024 closing of the record, Petitioner has filed a number of letters seeking various forms of ancillary relief.  On July 19, 2024, for instance, Petitioner sought leave to file a motion for provisional relief pursuant to Section 9004 of ICARA and, specifically, a court order to remove BFS from Respondent's custody and place BFS under the guardianship of Petitioner's friend Michael Gregory Gong.  (*See generally* Dkt. #150).  On August 9, 2024, Petitioner filed a letter motion seeking an order to show cause why Respondent should not be held in criminal contempt or, in the alternative, civil contempt, for failing to comply with this Court's orders authorizing Petitioner's daily video calls with BFS.  (*See generally* Dkt. #152).  On August 19, 2024, Petitioner filed a letter motion seeking a conference to address the same.  (*See generally* Dkt. #154).  On August 30, 2024, Petitioner filed a letter motion to reopen the proceedings.  (*See generally* Dkt. #164). Most recently, on September 6, 2024, Petitioner filed a letter seeking to withdraw his July 19, 2024 letter.  (*See generally* Dkt. #166).  These requests remain pending.

During the same time period, Respondent filed two certified copies of the French judgments and an apostille.  (*See generally* Dkt. #156-1, 156-2, 156-3, 161-1, 161-2).  In response, Petitioner filed a letter opposing this Court's consideration of the French judicial documents.  (*See generally* Dkt. #159).

## APPLICABLE LAW

The Hague Convention on the Civil Aspects of International Child Abduction "was adopted in 1980 in response to the problem of international child abductions during domestic disputes." *Golan* v. *Saada,* 596 U.S. 666, 670 (2022) (quoting *Abbott* v. *Abbott*, 560 U.S. 1, 8 (2010)).  Its purpose is

> to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access.

Hague Convention, pmbl.  Both the United States and Poland are among the more than 100 countries that have ratified the Convention.  *See Convention of 25 Oct. 1980 on the Civil Aspects of Int'l Child Abduction, Status Table*, Hague Conference on Private Int'l Law, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 [https://perma.cc/WF95-97QS] (last visited September 12, 2024).

"The Convention's core premise is that the interests of children in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence." *Golan*, 596 U.S. at 670 (internal quotation marks omitted).  In accordance with this principle, the Convention "generally requires the prompt return of a child to the child's

country of habitual residence when the child has been wrongfully removed to or retained in another country." *Id.* (citing Hague Convention, arts. 1(a), 12). The Convention instructs its contracting states to "take all appropriate measures to secure within their territories the implementation of the objects of the Convention," using "the most expeditious procedures available." Hague Convention, art. 2.

To implement the Convention, Congress enacted the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001-11, in 1988. *See generally Swett v. Bowe*, — F. Supp. 3d —, No. 24 Civ. 1379 (PAE), 2024 WL 2034713, at *3 (S.D.N.Y. May 7, 2024). Pursuant to ICARA,

> [a]ny person seeking to initiate judicial proceedings under the Convention for the return of a child … may do so by commencing a civil action by filing a petition for the relief sought in any court … which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed.

22 U.S.C. § 9003(b). In adjudicating a Hague Convention petition, "[t]he court in which [the] action is brought …. [must] decide the case in accordance with the Convention." *Id.* § 9003(d). To that end, the court must "determine only [the parties'] rights under the Convention and not the merits of any underlying child custody claims." *Id.* § 9001(b)(4); *see also* Hague Convention, art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue.").

Under ICARA, the party petitioning for the child's return bears the burden of establishing by a preponderance of the evidence that the child was

wrongfully removed or retained.  22 U.S.C. § 9003(e)(1).  Removal or retention of a child is wrongful when (i) "the child was habitually resident in one State and has been removed to or retained in a different State"; (ii) "the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence"; and (iii) "the petitioner was exercising those rights at the time of the removal or retention."  *Gitter* v. *Gitter*, 396 F.3d 124, 130-31 (2d Cir. 2005).  If a petitioner can establish that the removal or retention of his child was wrongful, he has made out a *prima facie* case for the child's return. *In re D.T.J.*, 956 F. Supp. 2d 523, 528 (S.D.N.Y. 2013).

Where a petitioner has made out a *prima facie* case for his child's return, the respondent can prevent the repatriation of the child if she is able to establish that "one of the narrow exceptions set forth in the Convention applies."  22 U.S.C. § 9001(a)(4); *see also id.* § 9003(e)(2).  These exceptions include:

- At least one year has passed since the "date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State" and "the child is now settled in its new environment," Hague Convention, art. 12;

- "[T]he person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention," *id.*, art. 13(a);

- "[T]here is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," *id.*, art. 13(b).

The first two of these defenses must be established by a preponderance of the evidence, *see* 22 U.S.C. § 9003(e)(2)(B), while the third must be established by clear and convincing evidence, *see id.* § 9003(e)(2)(A).

Importantly, these exceptions "do not authorize a court to exceed its Hague Convention function by making determinations, such as who is the better parent, that remain within the purview of the court with plenary jurisdiction over the question of custody." *Blondin* v. *Dubois*, 189 F.3d 240, 246 (2d Cir. 1999). The Second Circuit has warned that "a systematic invocation of [these] exceptions, substituting the forum chosen by the abductor for that of the child's residence, would lead to the collapse of the whole structure of the Convention by depriving it of the spirit of mutual confidence which is its inspiration." *Id.* (quoting Elisa Perez-Vera, *Explanatory Report: Hague Conference on Private International Law*, *in* 3 ACTS AND DOCUMENTS OF THE FOURTEENTH SESSION 426 (1980)). To that end, even "[w]here a defense has been established, 'it remains within the discretion of a court whether to allow the child to remain with the abducting parent or to order repatriation.'" *Swett*, 2024 WL 2034713, at *3 (quoting *In re D.T.J.*, 956 F. Supp. 2d at 529).

## CREDIBILITY DETERMINATIONS

To the extent that the Court's findings herein are based in whole or in part on any witness's testimony, the Court's findings reflect its determination as to that witness's credibility, based on the Court's assessment of the witness's demeanor and potential bias, as well as the extent to which the testimony was "inherently logical and consistent with the testimony of other

witnesses and relevant documentary evidence." *Swett*, 2024 WL 2034713, at *4.

Beginning with the testimony of Respondent and Respondent's witnesses, the Court found most of the testimony credible; it was broadly internally consistent and corroborated by a variety of documentary evidence. Respondent herself gave clear and measured answers to counsel's questions, even in the face of intense cross-examination. As just one example, when confronted with examples of her communications with Petitioner after she arrived in the United States — in which Respondent came across as broadly deferential to Petitioner — Respondent did not become angry or defensive. Rather, Respondent carefully explained that she had sent the flattering messages to "calm [Petitioner] down or not make him angry." (*See* Tr. 30:25-45:8 (Testimony of Resp.) ("I sent this message to flatter [Petitioner] and to get a positive reaction out of him to have another peaceful day and not stressful."); *see also id.* at 691:8-692:17 (Testimony of E. Fernandez) (explaining that it is common for victims of intimate partner violence to try and appease their abusers)). Additionally, Respondent was forthcoming in her answers, even when the truth did not paint her in the best light; among other things, she acknowledged that she may have started some fights between her and Petitioner and that she was sometimes upset or aggressive. (*See id.* at 78:22-79:20 (Testimony of Resp.)).

The testimony of Petitioner's witnesses was broadly credible, albeit less useful than that of Respondent's witnesses. As an initial matter, the Court

15

notes certain limitations to the testimony that Petitioner's witnesses provided. Specifically, none of Petitioner's witnesses testified that they were present for any of the incidents of abuse alleged by Respondent, and therefore none could opine on whether any particular incident had happened. Further, several of Petitioner's witnesses had only visited the couple's home on a handful of occasions. (*See* Tr. 500:23-504:12 (Testimony of A. Pilarczyk) (indicating she only visited on three or four occasions, never for more than a few hours and at least twice in the context of a party with other guests); *id.* at 512:2-513:6 (Testimony of P. Montana) (indicating that he knew the parties for six months before Respondent left for the United States and visited their home only three times for parties or for professional engagements)).

The testimony of certain of Petitioner's fact witnesses suffered from additional shortcomings. Tatenda Madzivanyika's testimony, for instance, was largely ineffective; she was unable to recall basic facts, such as when she worked for the parties or the fact that Respondent and BFS took a ten-day vacation during her employment with the parties. (*See* Tr. 527:18-532:17 (Testimony of T. Madzivanyika)). Worse yet, she contradicted her written declaration, which she admitted that she did not author. (*See id.* at 532:18-25). The testimony of another one of Petitioner's witnesses, Maciej Dzierzawski, was muddled at best, and contradictory at worst, insofar as his explanation of his business relationship with Petitioner went. (*See id.* at 542:16-549:17 (Testimony of M. Dzierzawski)). Finally, Paul Montana's testimony was generally flippant and careless; he contradicted his written

16

declaration on matters firmly within his own knowledge (*i.e.*, whether he had pleaded guilty to a domestic violence offense) and treated the non-consensual sharing of intimate photographs sent to him by women with Petitioner as a humorous matter.  (*See id.* at 515:18-518:11, 520:17-522:18 (Testimony of P. Montana)).

The only trial testimony the Court found wholly *in*credible was that of Petitioner.  As the Court details in its Findings of Fact below, Petitioner has repeatedly, and egregiously, lied to this Court over the course of these proceedings, including at trial.  The Court finds that the degree and consistency of Petitioner's dishonesty with this Court constitutes grounds for the blanket discrediting of his trial testimony.

**FINDINGS OF FACT**

The findings of fact that follow are based on the Court's careful review of the entire trial record.  Except where otherwise indicated, where facts are recited, the Court finds the fact recited to be true.  Where the Court states a witness's perspective on a point, the Court finds such to have been the witness's perspective, not that that perspective was necessarily correct.  Further factual findings are contained in the ensuing Conclusions of Law section.

**A.     The Parties**

Petitioner Sebastien Funez Mene, upon information and belief, was born in France in or around 1973.  (Resp. Decl. ¶ 3).  He has lived most of his life in

France.  (*Id.*).  In 2015, after meeting Respondent, Petitioner moved to Poland, and has resided there ever since.  (*See* Tr. 317:3-8 (Testimony of Pet.)).

Respondent Kaja Sokola was born in Wroclaw, Poland on May 4, 1986. (Resp. Decl. ¶ 2).  At the age of thirteen, she began modeling professionally; she thereafter lived in New York City "on and off" between the ages of sixteen and twenty-three.  (*Id.*).  At twenty-three, Respondent returned to Poland to attend the University of Social Science in Wroclaw, where she received a Bachelor's Degree in Psychology and a Master's Degree in Clinical Psychology, completing her studies in 2014.  (*Id.*).  Today, Respondent is a certified addiction and co-dependence psychotherapist and Gestalt psychotherapist.  (*Id.*).  Respondent has a serious heart condition, namely, an aortic aneurysm, and suffers from arrhythmia.  (*Id.* ¶ 7).

The parties' son, BFS, was born in Poland in 2019; today, he is around five-and-a-half years old.  (Resp. Decl. ¶ 5).  BFS has general developmental delays for which he receives a variety of special services.  (*Id.* ¶ 171).

## B.    The Start of the Parties' Relationship

Petitioner and Respondent met in May 2015, when Respondent commented on a photograph that Petitioner had posted on Facebook.  (Resp. Decl. ¶ 17).  Petitioner responded to Respondent's comment, and the two began corresponding on Facebook and, later, via phone call.  (*Id.*).  After the parties messaged on Facebook for a day, Petitioner invited Respondent to stay with him in Cannes, France, during the Cannes Film Festival.  (*Id.* ¶ 18). Respondent was offended by the forwardness of the request, and Petitioner

18

apologized; Petitioner suggested that he visit Respondent in Poland instead. (*Id.*).

Petitioner and Respondent met for the first time in person when Petitioner came to visit her in Warsaw, Poland in June 2015. (Resp. Decl. ¶ 20). Two days into his visit, Petitioner proposed to Respondent. (*Id.* ¶ 21). At the time, Respondent thought Petitioner "was the perfect man and that [she] was just so lucky," and happily accepted his proposal. (*Id.*). Days later, on June 16, 2015, the pair were married in a church. (*Id.* ¶ 22). Shortly after the wedding, Petitioner flew to Lyon, France, where he was then residing with his parents; though the sudden departure upset Respondent, Petitioner assured her that he "had an urgent and important case" that required him to get back to France immediately. (*Id.* ¶ 23).

In August 2015, Respondent flew to Lyon to rejoin Petitioner. (Resp. Decl. ¶ 25). She expressed a desire to meet his family, but Petitioner declined to introduce her to his parents, saying he "didn't have the time." (*Id.*). After two hours in Lyon, Petitioner drove the couple over 1,700 kilometers back to Warsaw, Poland. (*Id.* ¶ 26). Petitioner thereafter moved into Respondent's Warsaw apartment, and the parties resided together for the majority of their relationship, with the exclusion of a brief period of separation in 2020-2021. (*Id.* ¶¶ 27, 89). Petitioner has not returned to France since the August 2015 trip. (*Id.* ¶ 27; Tr. 432:13-21 (Testimony of Pet.)).

Petitioner underwent surgery on his back shortly after arriving in Poland in September 2015. (Resp. Decl. ¶ 28). The pair then had a civil wedding

ceremony in a city just outside of Warsaw.  (*Id.* ¶ 31).  Petitioner asked

Respondent not to invite her family to the wedding because his family could not

attend.  (*Id.* ¶ 32).  Two of Respondent's friends, acting as the couple's

witnesses, attended the civil ceremony.  (*Id.* ¶ 31).  At the time of the wedding,

Respondent was twenty-nine years old, and Petitioner was forty-two.  (*Id.* ¶ 33).

In 2018, Respondent became pregnant with BFS, as a result of Petitioner's

sexual abuse detailed below.  (*Id.* ¶ 48).

## C.    Petitioner's Abuse of Respondent

Throughout the parties' relationship, Petitioner was psychologically,

financially, and physically abusive toward Respondent.  The Court provides a

sampling of illuminative testimony below.

### 1.    Emotional Abuse

Multiple witnesses reported that Petitioner was disposed to fits of rage.

Respondent herself indicated that Petitioner "g[ot] angry and upset over

everything all the time."  (*See* Tr. 40:17-23 (Testimony of Resp.) ("[Petitioner]

would get angry and upset over not responded message, over … a teaspoon

that was put … in the wrong place.")).  Respondent's sister similarly testified

that she witnessed "[Petitioner] get upset over very little things, such as

[Respondent] buying a different vegetable or cooking something not to his

liking."  (E. Sokola Aff. ¶ 4).  For example, in one instance, early in

Respondent's pregnancy with BFS, Respondent forgot to feed the couple's cats.

(Resp. Decl. ¶¶ 52-54).  In response, Petitioner threatened to "hit [her] on the

head with a baseball bat to make [her] behave," all the while "yelling in [her]

ear with his fist next to [her] head." (*Id.* ¶¶ 53-54). At the time, Respondent feared that she would miscarry. (*Id.* ¶ 55).

After BFS was born, Petitioner continued to behave erratically, often in front of the parties' young child. (*See, e.g.*, Tr. 174:17-19 (Testimony of B.P. Sokola) (indicating that she saw Petitioner "waving his arms, threatening [Respondent] with a fist in the presence of [BFS], screaming because the child was scared")). Respondent's neighbor Bozena Anna Janowska, for instance, reported intervening in a fight between Respondent and Petitioner in 2020. (B.A. Janowska Aff. ¶¶ 1-2). Janowska testified that she entered the couple's home to "find [Respondent] crying and holding a terrified crying [BFS] in her arms." (*Id.* ¶ 3). At the time, Petitioner "was acting very insane and nervous, waving his arms and hands and screaming loudly." (*Id.* ¶ 5). When Respondent managed to sneak out of the house and into Janowska's car, Petitioner "rushed to the car and tried to force it open"; Janowska and Respondent managed to drive away only after Janowska threatened to call the police. (*Id.* ¶ 8).

In addition to Petitioner's recurrent fits of rage, the testimony also revealed that Petitioner regularly demeaned Respondent. (*See, e.g.*, Resp. Decl. ¶ 10 ("[Petitioner] [would] say[] that I was sick and anorexic, that he would put me in a psychiatric hospital because I was sick and had eating disorders."); *id.* ¶ 39 ("He would … compare me to a child[.]"); *id.* ¶ 104 ("He would shout at me that I was a shopaholic … and [that] he needs to teach me how to manage money, that he needs an adult partner, not a little girl.")). Respondent's sister

21

noted that Petitioner would "frequently diminish [Respondent]'s accomplishments, education[,] or career." (E. Sokola Aff. ¶ 4). Respondent's friend Jarmila Moderska reported that Respondent used to tell Moderska that "she was always trying to please [Petitioner] and felt as though no matter what she did, it was never good enough for [Petitioner]." (J. Moderska Aff. ¶ 5). Further, on account of her purported shortcomings, Petitioner repeatedly threatened to take BFS away from Respondent. (*See* Resp. Decl. ¶¶ 10, 90, 147, 161, 182; E. Sokola Aff. ¶ 3; J. Moderska Aff. ¶ 7).

Finally, witnesses described how Petitioner exercised strict control over Petitioner in several different aspects of her life. For example, Respondent's sister claimed that Petitioner "controlled what [Respondent] ate, especially during her pregnancy." (E. Sokola Aff. ¶ 9). In one instance, Petitioner forced Respondent to eat a plate of food while she was breastfeeding BFS, saying to her: "[I]f you don't eat this fucking dinner, you are going to regret it[;] you are feeding my child." (Resp. Decl. ¶ 59). Additionally, Respondent's mother reported that Petitioner "tried to isolate [Respondent] from [her family]"; when Respondent's family would visit the couple, Petitioner "would not let [the family] stay with [him and Respondent,] and "tried to control he way in which [the family] spent time with [Respondent]." (B.P. Sokola Aff. ¶ 10).

### 2. Financial Abuse

In addition to his emotional abuse of Respondent, Petitioner also subjected Respondent to financial abuse. Several witnesses reported that Petitioner would control Respondent's spending; according to Respondent's

sister, Petitioner "would often get upset if she spent money [that] she was not permitted to, even if it was money she earned herself." (E. Sokola Aff. ¶ 16). For this reason, at times, Respondent was "terrified about spending any [money]," for fear of angering Petitioner. (*Id.* ¶ 16). In one instance, when Respondent fled the couple's home in November 2020, Petitioner cut off her access to the couple's joint bank account, leaving her without money to feed herself and BFS. (Resp. Decl. ¶¶ 110-111).

Multiple witnesses also explained how Petitioner used his control over Respondent's parents' home as a means of coercion in the parties' relationship. Specifically, in late 2016, the parties bought a large home in Warsaw. (Resp. Decl. ¶¶ 105-106). The couple used Respondent's parents' house as collateral on the mortgage that they took out for the home. (*Id.* ¶ 106). Respondent testified that, thereafter, "[w]henever [Petitioner] would provoke arguments with [her], he would threaten to stop paying the mortgage, knowing that the result would be [Respondent's] parents being made homeless." (*Id.* ¶ 107; *see* Tr. 76:18-21 (Testimony of Resp.) ("[T]he banks said clearly that if we would stop paying, and my mother, which frightened her terribly, received a paper that she has to pay over [three] million zloty, if not, she's going to lose her house.")). Respondent's mother similarly testified that "[Petitioner] threatened all the time that the bank would seize her house (which [she] provided as collateral for the [couple's] mortgage [on their home])." (B.P. Sokola Aff. ¶ 13).

At trial, Petitioner did not deny making these threats. (*See* Tr. 362:23-363:3 (Testimony of Pet.)). Indeed, on the morning Respondent was set to

testify live in this matter, Petitioner wrote to her directly about the mortgage on the home in Poland.  (*See id.* at 365:11-366:22 (Testimony of Pet.)).  What is more, any notion that Respondent's parents' home was never at risk was soundly disproven.  Petitioner admitted that he did, in fact, stop paying the mortgage when Respondent did not return to Poland.  (*See id.* at 362:7-22 (Testimony of Pet.)).  And documentary evidence proffered by Respondent indicates that the mortgage has since been terminated (*see* Ex. R-18), and the bank that provided the mortgage has demanded payment of over three million zloty by Respondent's mother (*see* Ex. R-19).

### 3.    Physical Abuse

Respondent herself testified to multiple instances of physical abuse at the hands of Petitioner.  This abuse began soon after the parties were married, as early as the summer of 2016, when Petitioner "physically shoved [Respondent] down onto the ground" and screamed at her for purchasing an expensive raincoat on a trip to Sopot, Poland.  (Resp. Decl. ¶¶ 35-36).  As another example, in the winter of 2018-2019, late in Respondent's pregnancy with BFS, Respondent reported that Petitioner "twisted [her] arm and pushed [her] against the wall."  (Resp. Decl. ¶ 56).  On a third occasion, in November 2019 — in response to Respondent's request to go to Wroclaw to visit her family — Petitioner "pushed [her] cheek against the glass of [a] window," screaming at her as she begged him to let her go.  (*Id.* ¶¶ 60-62).  At the time, BFS was in the room with the couple, in a fenced-off area by the television, with a view to the altercation.  (*Id.* ¶ 61).

Petitioner's physical abuse of Respondent also included sexual abuse. Respondent recounted a particularly gruesome episode of sexual abuse surrounding the conception of BFS.  Respondent had just returned from a trip to Canada for a modeling job and, as she was falling asleep, Petitioner "forced [her] to have sex with him against [her] will."  (Resp. Decl. ¶ 48).  Contrary to the couple's customary practice, Petitioner "did not pull out."  (*Id.*). Respondent later discovered that she was pregnant, which in turn meant "that [she] wouldn't be able to travel anymore, and certainly would not be able to model."  (*Id.* ¶ 49).  At the time, Respondent believed that Petitioner "wanted to get her pregnant because he was always minimizing her career and trying to get her to stay home instead."  (J.R. Hardin Aff. ¶ 10; Tr. 22:22-23:1 (Testimony of Resp.) ("[Petitioner] believed that [it is] a woman's duty … to cook, clean the house, and take care of kids.")).  Respondent accordingly "felt like [she] was a possession to [Petitioner] and trapped."  (Resp. Decl. ¶ 49).

Respondent often reported the physical abuse to her family members, who also witnessed signs of the violence (if not the violence itself) firsthand. For instance, Respondent's sister, Ewa Sokola, reported "personally witness[ing] [Petitioner's] rage several times."  (E. Sokola Aff. ¶ 3).  According to her, "[Petitioner's] screams and shouts would last a long time," and "[h]e would get right in [Respondent]'s face while screaming and sometimes push her." (*Id.*).  Respondent's sister further reported that she had seen "photos of bruising on [Respondent's] arms and legs which [Respondent] attributed to [Petitioner] kicking her or grabbing her tightly."  (*Id.* ¶ 15; *see also* Tr. 239:20-

25 (Testimony of E. Sokola) ("I'm talking about [] a huge bruise on her leg, and [Respondent] called us …. crying … I don't think if she [just] bump[ed] against something, she would be crying and calling us.")).  Respondent's mother testified that she "saw [Petitioner] many times standing over [Respondent] and shouting at her."  (B.P. Sokola Aff. ¶ 9).  Respondent's mother further claimed that Respondent told her that Petitioner had repeatedly "threatened [Respondent] with death," once "promis[ing] to do it in a way that would mean that nobody would find her."  (*Id.*).

Respondent's family members were not the only people who corroborated Respondent's claims concerning Petitioner's physical abuse of her.  Respondent's friend Jarmila Moderska, who would visit with Respondent every couple of months when Moderska visited Poland, reported that Respondent told her that Petitioner "made [Respondent]… afraid for her safety."  (J. Moderska Aff. ¶ 4).  Moderska also noted that "[Respondent] would mention [to Moderska] that [Petitioner] had been abusive towards her [] physically … that he would grab or twist her a[r]m and make constant threats to take BFS away from her."  (*Id.* ¶ 7).  Respondent's reports of abuse escalated to the point that Moderska herself "told [Respondent] [that she] was afraid for [Respondent's] safety and that of BFS[]," and agreed with Respondent that she should leave Poland with BFS for the United States.  (*Id.* ¶ 9; Tr. 156:22-23 (Testimony of J. Moderska) ("I advise[d] her to go to states as I knew that [Petitioner] c[ould]n't go there, so she would be safer.")).

26

Respondent also reported the abuse to various professionals and at least one Polish government authority, though she never went to the police, fearing retribution from Petitioner. (*See* Tr. 24:15-28:11 (Testimony of Resp.); *id.* at 231:12-17 (Testimony of E. Sokola) ("[Respondent] was very much afraid of police taking [Petitioner] to prison since they had a huge mortgage on the house, and also my parents' house was involved as a second collateral mortgage. And [Petitioner] going to prison would mean letting us be without the roof, [Respondent], BFS, and my parents[.]"); *id.* at 692:18-693:3, 694:5-10 (Testimony of E. Fernandez) (explaining that it is common for victims of domestic violence to fail to report their abusers to police)). For instance, after the November 2019 incident, Respondent "called the Blue Line" (Poland's domestic violence hotline) and spoke to a psychologist about the incident; she also reported the altercation to multiple therapists. (Resp. Decl. ¶¶ 68, 71-72; *see also, e.g.*, Ex. R-4 (November 3, 2019 letter from Respondent to therapist describing Petitioner's physical abuse of her)). After a different incident in March 2021, wherein Petitioner "kicked [Respondent's] right thigh" so hard that she fell to the floor (all in front of BFS), Respondent took photographs of her bruised leg and sent them to Daria Drab, the couple's therapist. (Resp. Decl. ¶ 96-97; *see also* Ex. R-10, R-11, R-12, R-13). Drab instructed Respondent to leave the couple's home. (Resp. Decl. ¶ 97; Ex. R-10).

## D.    **Petitioner's Abuse of Others**

Reports of Petitioner's abuse stretch beyond that which he inflicted upon Respondent. As an initial matter, several witnesses testified about animal

abuse at the hands of Petitioner.  For example, Respondent's mother reported that, during one of her visits to the couple, a mirror had fallen off of the wall while the parties were out.  (B.P. Sokola Aff. ¶ 7).  Apparently believing the parties' two small French bulldogs were to blame for the broken mirror, Petitioner "attac[k]ed the dogs, grabbed them by the necks and threw them out of the room."  (*Id.*; *see also* Tr. 202:16-25 (Testimony of B.P. Sokola) (indicating Petitioner acted with "fury" and threw the dogs "with anger")).  Respondent testified that, on another occasion, Petitioner threw one of the dogs at the wall for urinating inside the house, necessitating veterinary treatment.  (Resp. Decl. ¶ 154; *see also* Ex. R-24 (contemporaneous vet report) (stating that dog was "suddenly, lifted too strongly by the armpits, also hit by the master because of peeing in the house")).

Petitioner also abused individuals other than Respondent.  Respondent's mother testified that, once, Petitioner had jumped towards her and screamed at her for feeding the parties' dogs when she was visiting their home.  (B.P. Sokola Aff. ¶ 6; Tr. 341:17-343:6 (Testimony of Pet.) (describing his perspective on the incident)).  Respondent's mother also reported that, on another occasion, she saw Petitioner "grab[] [Respondent's nephew] during an argument and thr[o]w him out of the room."  (B.P. Sokola Aff. ¶ 8; *see also* Tr. 195:1-7 (Testimony of B.P. Sokola) ("[Petitioner] grabbed [the boy] by the front of his sweater and [] throwed him out of the room.")).  Respondent's sister (the boy's mother) corroborated this account, stating that, on the same occasion, Petitioner

"pushed h[er son] out of the room," and adding that Petitioner thereafter "locked him in the bathroom." (*See* Tr. 223:16-21 (Testimony of E. Sokola)).

Respondent testified that, on yet another occasion, she heard BFS's babysitter Natalia "screaming" upstairs because Petitioner had "pushed her away" when she was changing BFS. (Resp. Decl. ¶ 74; *see* Tr. 377:12-23 (Testimony of Pet.) (largely admitting the same); Ex. R-7 (contemporaneous text messages between Respondent and Petitioner's cousin about the incident) ("He is so interrupting with the babysitter that we have that the girl had tears in her eyes today … Natalia won't work with him.")). The very next day, while the babysitter was trying to feed BFS, Petitioner "forcibly grabbed the spoon from her saying that she was not doing it correctly." (Resp. Decl. ¶ 76).

Most importantly, the parties' child BFS was not spared from Petitioner's abuse. Of course, Petitioner's abuse of Respondent often occurred in the presence of BFS, itself a form of abuse. (*See, e.g.*, E. Fernandez Rep. 17 ("[Even] if the child is not the direct victim of abuse, children who are exposed to [abuse] can be impacted by an increased risk of psychological illness that can interfere with their health, social and emotional and interpersonal behaviors … [Petitioner] has continued various forms of verbal abuse and coercion in the presence of [BFS], which despite being targeted at [Respondent], can still cause harm to [BFS].").

The trial also revealed significant evidence of Petitioner's direct psychological abuse of BFS. For instance, when BFS struggled to say certain words at Petitioner's command (notwithstanding BFS's speech impediments),

Petitioner would scream at BFS as well as Respondent, stating that BFS was "retarded" due to Respondent's "bad mothering." (Resp. Decl. ¶ 149; E. Sokola Aff. ¶ 13 ("I recall once that [Petitioner] was trying to teach BFS the words of colors and witnessing him screaming at him because of it.")). Additionally, when BFS would not eat all of the food he was served, Petitioner was known to "slam his fist on the table and shout that he would not raise a capricious child." (Resp. Decl. ¶ 148). Clearly, BFS was not insulated from Petitioner's unpredictability and propensity to anger.

Finally, there was some, albeit limited, testimony regarding physical abuse of BFS by Petitioner. Namely, on one occasion, when BFS was two years old, Respondent's mother recalled seeing Petitioner "grabbing, pushing[,] and shaking BFS." (B.P. Sokola Aff. ¶ 8; *see also* Tr. 196:9-23 (Testimony of B.P. Sokola) ("I witnessed it. I saw it. That happened in my presence. What if I w[as]n't there?")). Respondent herself claimed that "[Petitioner] would shake BFS when [BFS] didn't want to eat something, and when BFS was crying he would yell at him or shake him by his arms." (Resp. Decl. ¶ 100). Respondent also testified to one instance in which Petitioner pushed her over "into the mud" while she was holding BFS. (*Id.* ¶ 101). The Court acknowledges the limited, but serious, nature of these allegations.

## E.    Respondent Takes BFS to the United States

Respondent began contemplating her escape from Petitioner in 2021. (Resp. Decl. ¶ 163). Using the fact that she "need[ed] to go to New York to testify in [her] case against Disney and Harvey Weinstein" as an excuse,

30

Respondent flew to New York with BFS in January 2022.  (*Id.* ¶¶ 163-165).
After arriving in New York, Respondent attempted to "keep [Petitioner] happy
and to avoid suspicion from him that [she and BFS] w[ere] not going to return
[to Poland]." (*Id.* ¶ 169).  Respondent and BFS had tickets to return to Poland
on March 14, 2022, but Respondent continued to exchange those tickets for a
later return date, until it was clear that she and BFS would not be going back.
(*Id.*).

From Poland, Petitioner continued his efforts to exercise control over
Respondent in New York.  Petitioner constantly called Respondent and
demanded to speak to BFS for as long as he wanted.  (Resp. Decl. ¶ 168).  On
one occasion in or around February 2022, when Respondent did not answer
Petitioner's calls, Petitioner contacted Respondent eighty times in one day.  (*Id.*
¶ 181).   Petitioner also hired private detectives to surveil Respondent.  (*See id.*;
Ex. R-46, R-47 (June 2022 messages from Petitioner to private investigative
firm sharing photos of Respondent and BFS, *inter alia*)).  And Petitioner
reported Respondent to the New York City Police Department (the "NYPD") on
several occasions, resulting in NYPD visits to Respondent.  (*See* Ex. R-44, R-45;
Dkt. #145).

Once she was safely out of Petitioner's reach, Respondent reported
Petitioner's abuse of her and BFS to the Polish authorities and, on or about
April 13, 2022, the District Prosecutor's Office for Warsaw Praga South in
Warsaw, Poland, opened an investigation into Petitioner's alleged crime under
Article 207 § 1 of the Polish Criminal Code (abuse of a family member).  (Resp.

Decl. ¶¶ 167, 175).  Since that time, the District Prosecutor has brought
charges against Petitioner stemming from both his abuse of Respondent and
his purported animal abuse.  (*See* Ex. R-42 (May 31, 2023 letter to Respondent
from District Prosecutor's Office for Warsaw Praga South indicating that
Petitioner was indicted)).  In July 2022, Respondent served Petitioner with
divorce papers.  (Resp. Decl. ¶ 175).  The parties' divorce proceedings remain
ongoing in Polish court.  (*Id.*).

**F.     Despite Developmental Delays, BFS Thrives in the United States**

Since arriving in the United States, Respondent has worked to ensure
that BFS has received appropriate professional help for his developmental
delays (Resp. Decl. ¶ 166), including special education services (*see, e.g.*,
Ex. R-39) and speech-language therapy (*see, e.g.*, Ex. R-40).  Moreover, during
this time, there has been meaningful improvement in BFS's "[e]motional,
intellectual, [and] motor skills."  (Tr. 111:13-21 (Testimony of Resp.); *see also,
e.g.*, Ex. R-38 (September 25, 2023 medical assessment of BFS by his
pediatrician confirming that BFS's speech delay has improved significantly in
the last year)).

The reports of various practitioners who work with BFS on a regular
basis that were entered into evidence at trial confirm the same.  For instance,
in a Special Education Service Report dated September 28, 2023, BFS's special
education teacher writes:

> [BFS] began special education service in April 2023,
> initially displaying low self-confidence, avoiding eye
> contact, and communicating primarily through sounds,
> gestures, and body language.  He engaged in parallel

play and had limited interest in toys. However, over the past six months, [BFS] has shown remarkable progress in his response to therapies and has opened up significantly.

(Ex. R-39). A separate report from BFS's speech-language pathologist notes:

> [BFS] has been seen two times weekly for 45 minutes since February 2023 for individual speech and language therapy sessions at his school. … [BFS] has shown a strong and steady progression with his social emotional skills since meeting him in February 2023. He appears more calm and confident within interactions with both his peers and teachers this school year. [BFS] is comfortable in the classroom, asserts himself as necessary and negotiates social situations more easily. It is nice to see how well he has become adjusted to the classroom and his peers over the past few months.

(Ex. R-40). These and other reports make clear that BFS has made significant progress on account of the care — including dedicated speech, developmental, and special education therapy — that Respondent has secured for him in New York.

Conversely, testimony at trial confirmed the deleterious impact of removing BFS from these therapies. Dr. Fernandez specifically testified about the impact that repatriation would have on BFS, noting that "[BFS] appears to be acclimating to his environment in a psychologically healthy and appropriate manner" based on "his current developmental and educational progress"; further, "[a]ny disruption to this would risk the development of mental health symptoms of such as anxiety and depression," which "could disrupt [t]his progress." (E. Fernandez Rep. 18).

### G.    Petitioner's Lies to This Court

Against the convoluted procedural history of this case, Petitioner's dishonesty with this Court is perhaps the most robust through-line.  The Court outlines below three false narratives — one about Petitioner's French citizenship; one about his payment of court-ordered child support for BFS; and one about his French criminal record — that were unwound over the course of these proceedings.  These examples serve to establish that Petitioner's statements to the Court, as a general matter, simply cannot be credited.

#### 1.    Statements About His French Citizenship

Throughout these proceedings, Petitioner has repeatedly misrepresented his status *vel non* as a French citizen.  By way of background, in the beginning stages of these proceedings, Petitioner repeatedly claimed that he neither was nor ever had been a French citizen.  (*See, e.g.*, Dkt. #48-2 (July 12, 2023 letter from Petitioner's counsel to Respondent's counsel) at 9 ("Petitioner has repeatedly indicated that he is a citizen of Spain....  Respondent offers not a shred of evidence that Petitioner held or holds a French passport."); Dkt. #52 (Petitioner's August 24, 2023 letter to the Court) at 2 ("Petitioner has described that he has Spanish Citizenship and not French Citizenship."); Dkt. #56 (Petitioner's September 19, 2023 sworn declaration) at ¶¶ 6-7 ("I am not a French Citizen.  I am a Spanish Citizen holding a Spanish Passport."); Dkt. #65 (transcript of September 6, 2023 conference) at 45:3-6 (representation of Petitioner's counsel) ("[Petitioner] [i]s not a French citizen, doesn't have a French passport, and just because the other side repeats that over and over

34

again doesn't make him a French citizen.")).  It would soon become clear, however, that these statements were false.  (*See, e.g.*, Dkt. #69 (Respondent's October 14, 2023 letter to the Court) at 3 ("This week we identified, buried in Petitioner's production, a [document] ... which confirms that Petitioner did have and did travel on both a French and a Spanish passport." (citing Dkt. #69-4))).

Once it had become clear that he did, in fact, hold French citizenship for at least some time, Petitioner changed his story.  Instead, Petitioner swore that he had renounced his French citizenship in 2012 and destroyed his French passport.  (*See generally* Dkt. #70-1 (Petitioner's October 10, 2023 "Declaration Regarding Citizenship")).  Evidence introduced at trial undermined the veracity of this second story.  In a 2020 email introduced by Respondent at trial, Petitioner held himself out to be a French citizen.  (*See* Ex. R-65 (2020 email from Petitioner) (stating "I [Petitioner] am a foreign citizen ([F]rench)")).  Ultimately, while this Court cannot determine definitively if Petitioner is a French citizen, it can confidently conclude that Petitioner has repeatedly lied about the same.

### 2.    Statements About His Payment of Child Support

The trial in this matter also revealed that Petitioner had been dishonest about his payment of court-ordered child support for BFS.  As relevant here, on December 5, 2022, a Polish court ordered Petitioner to pay Respondent child support for BFS of $2,500 a month.  (*See* Ex. R-20, R-21; Resp. Decl. ¶ 113).  On cross examination at trial, Petitioner asserted that he had made these court-ordered child support payments through March 2023, amounting to a

total of four payments.  (*See* Tr. 466:23-467:13 (Testimony of Pet.) (indicating that he had made the child support payments in "December, January, February, and March")).  Yet an exhibit introduced at trial demonstrated that, in June 2023, Petitioner told the Polish authorities — in the course of an investigation into Petitioner's failure to make court-ordered child support payments — that he "did not voluntarily make a payment towards the awarded child support" after December 2022.  (*See* Ex. R-118; Tr. 471:25-472:25; *see also id.* at 473:7-10 (statement of the Court) ("You've testified in one way in this proceeding, you've testified in another way in a sworn statement to Polish authorities, and that's what the record is.")).  Indeed, two exhibits offered by Respondent demonstrate that Petitioner was criminally investigated in Poland for his failure to pay child support for BFS.  (*See* Ex. R-20, R-21).

At trial, Petitioner also denied emptying his bank accounts in December 2022 to frustrate the collection of his court-ordered child support payments. (*See* Tr. 468:1-3 (Testimony of Pet.) (asserting that he did not "empt[y] [his] accounts to zero at the end of 2022 to avoid the bailiff's attempts to collect child support")).  In truth, Respondent's Polish lawyers had to instruct a bailiff to seize Petitioner's first child support payment, after which point Petitioner moved all of his money to bank accounts that were out of reach of the Polish courts, such that the December 5, 2022 child support order could not be enforced.  (*See* Resp. FFCL ¶ 101).  Copies of Petitioner's bank statements, introduced by Respondent at trial, show that the relevant accounts were emptied by the end of January 2023.  (*See generally* Ex. R-22).  What is more,

Petitioner's contemporaneous correspondence corroborated the same. (*See* Ex. R-74 at 75 (text message sent by Petitioner on October 5, 2023) ("Since January I have left our account at [zero] to protect the assets of my son[.]")).

### 3. Statements About His Criminal Record

The most troubling of Petitioner's lies are those surrounding his criminal record. Since the beginning of these proceedings, Petitioner readily admitted that he had pleaded guilty to a felony domestic violence charge in California in 2012 (*see, e.g.*, Ex. R-25 (Petitioner's responses to Respondent's first set of interrogatories, dated April 13, 2023)), which conviction was later overturned (*see generally* Dkt. #112; Dkt. #112-1 (November 29, 2023 vacatur order)). Other than this conviction, however, Petitioner asserted again and again that he has a clean criminal record. (*See, e.g.*, Ex. R-25 (Petitioner's responses to Respondent's first set of interrogatories dated April 13, 2023) (listing no convictions other than the 2012 Conviction); Dkt. #48-2 (July 12, 2023 letter from Petitioner's counsel to Respondent's counsel) (describing Respondent's allegation that Petitioner had criminal convictions in France as a "fantasy which she ha[d] fabricated in her mind"); Dkt. #69-3 (Petitioner's September 19, 2023 "Declaration Regarding Discovery") ("I was/am not a French criminal.")). Indeed, Petitioner repeated these lies at trial:

> Q: Have you ever been convicted of a crime in France?
>
> A: No.
>
> Q: Have you ever been jailed in France?
>
> A: No.

(Tr. 330:4-7 (Testimony of Pet.)).

Documents uncovered by Respondent, however, demonstrate otherwise. These documents disclose that Petitioner has been convicted on four occasions of crimes in France and has served at least three prison sentences (two concurrently). (*See* Dkt. #120-1, 136-1). Specifically, a judgment[3] of the Court of Appeal of Grenoble, France, dated April 30, 2019, indicates as follows:

---

[3]    The Court finds that this judgment is admissible into evidence pursuant to 22 U.S.C. § 9005. *See Morrison* v. *Chang*, No. 23 Civ. 1655 (RAJ), 2024 WL 1765675, at *1 n.1 (W.D. Wash. Apr. 24, 2024) ("[A]uthentication of documents and information is not required for such information or documents to be admissible in [a Hague Convention Petition]."). (*See also* Pet. FFCL (Post) 11 ("However, even though [it is] not authenticated, for Convention purposes, [it is] admissible in the hearing pursuant to [ICARA] § 9005[.]")).

That said, even if the authenticity of this judgment were validly in dispute, the Court finds that it is appropriate to draw an adverse inference in favor of its authenticity on account of Petitioner's invocation of the Fifth Amendment in response to Respondent's request to produce this and other French judgments evidencing Petitioner's French convictions. As a general rule, "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter* v. *Palmigiano*, 425 U.S. 308, 318 (1976). That said, "an adverse inference can only be drawn as to questions that are actually asked [of the invoker]." *Picard* v. *Estate of Mendelow (In re Bernard L. Madoff Invs. Secs. LLC)*, 560 B.R. 208, 226 (Bankr. S.D.N.Y. 2016) (internal quotation marks omitted); *see also United States* v. *$62,552.00 in U.S. Currency*, No. 03 Civ. 10153 (RBC), 2015 WL 251242, at *8 (D. Mass. Jan. 20, 2015) ("The way the adverse inference works is that if a witness refuses to answer a question by invoking the Fifth Amendment, the Court can draw an inference that the answer to that question would be adverse to the claimant."). Accordingly, the appropriate adverse inference here is as follows: Petitioner's invocation of the Fifth Amendment in response to Respondent's request to produce the decision of the Court of Appeals of Grenoble indicates that Petitioner is in possession of this document and that his production thereof would implicitly authenticate it.

The Court finds that the drawing of this adverse inference is merited. An adverse inference is an appropriate sanction for the failure to produce a document where: (i) the party having control over the document had an obligation to timely produce it; (ii) the party that failed to timely produce the document had "a culpable state of mind"; and (iii) the missing document is "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *Residential Funding Corp.* v. *DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002). Here, each of these criteria is met: *first*, there is no doubt that Petitioner was obligated to produce the document pursuant to Respondent's motion to compel production of documents in accordance with Respondent's Fourth Request for Production. (*See generally* Dkt. #120; February 27, 2024 Minute Entry). *Second*, Petitioner had a culpable state of mind: Petitioner has never stated that he does not have a copy of the document or that it does not exist; he has simply refused to turn it over. *Third*, there is

- On September 25, 2012, Petitioner was sentenced to two years' imprisonment by a French court for forgery of an administrative document, the use of forged administrative documents, and interference in a public function. In brief, Petitioner had forged certain judicial documents to obtain the phone records of the family of the victim associated with his 2012 Conviction (the "California victim"). (Dkt. #120-1 at 21).

- On November 16, 2012, Petitioner was convicted by a French criminal court of fraud, forgery, and use of forgery, for which he was sentenced to four years' imprisonment (of which two were suspended). (*Id.* at 22).

- On the day he was released from prison, Petitioner opened up a phone line (in the name of a protected party under a restraining order and stay-away order pertaining to the California victim) to contact the California victim. (*Id.* at 21).

- From November 2013 until March 2014, Petitioner engaged in a campaign of malicious phone calls directed at the California victim and her relatives. (*Id.* at 15). Petitioner was on both parole and conditional release at the time of these acts. (*Id.* at 21).

- On March 19, 2014, Petitioner was placed under judicial supervision. Beginning in September 2015, Petitioner failed to report for regular check-ins with the French police. (*Id.* at 19-20).

---

little doubt that the document is relevant to Respondent's grave risk defense. Not only does it speak to Petitioner's truthfulness and credibility, but it also demonstrates Petitioner's history of domestic violence, his stalking and harassment of former intimate partners and their families, and his refusal to obey court orders, even when on probation and conditional release.

Additionally, on August 22, 2024, Respondent *did* submit certified copies of the June 2012 decision of the Tribunal de Grande Instance de Bourgoin-Jallieu; the March 19, 2018, decision of the Tribunal de Grande Instance de Bourgoin-Jallieu; and the apostille for the April 30, 2019 judgment of the Court of Appeal of Grenoble. (*See generally* Dkt. #156-1, 156-2, 156-3). On August 29, 2024, Respondent provided certified translations of the apostille for the April 30, 2019, judgment and the June 2012 decision. (*See generally* Dkt. #161-1, 161-2).

- ▪ On June 10, 2016, a French judge issued an arrest warrant for Petitioner for failure to comply with his judicial supervision order.  (*Id.* at 19).

- ▪ On March 19, 2019, Petitioner was sentenced to eight months' imprisonment by a French court.  (*Id.* at 15, 20).  This conviction was affirmed, with an increased prison term of one year, by a French appellate court on April 30, 2019.  (*Id.* at 23).

- ▪ On April 30, 2019, an arrest warrant for Petitioner was issued by the Grenoble Court of Appeal.  (*Id.*).

Accordingly, as it stands, there are (at least) two open arrest warrants for Petitioner in France: one for his failure to comply with his probation and parole (having fled France) and one for his harassment of the California victim and her family.  (Resp. FFCL ¶ 124).  Perhaps more troublingly, the judgment of the Court of Appeal of Grenoble made numerous observations regarding Petitioner's conduct in the course of those proceedings that apply equally to the instant case.  That Court observed that Petitioner "position[ed] himself as a victim through [] role reversal," that "the expert psychiatrist who examined [Petitioner] observed in him an egocentric or even narcissistic personality," and that Petitioner had "the audacity to file a complaint against [the California victim]" amidst the criminal investigations into his own behavior.  (Dkt. #120-1 at 22).[4]

---

[4]     To wit, Petitioner has sued Respondent in Spain, Poland, and New York, in addition to bringing this Hague Convention proceeding.  (*See* Ex. R-29, R-30, R-31).  Petitioner's case in Spain (*see* Ex. R-29) seeks a conviction of Respondent that will result in a prison sentence of six months to two years.  (*See* Tr. 442:19-443:4 (Testimony of Pet.)).  Art. 225 *bis* Spanish Criminal Code.

Clearly, Petitioner's statements regarding his lack of a criminal history in France were a complete and utter fabrication. Moreover, the Court is disturbed by the confidence with which such lies were repeatedly pronounced, under oath, before this Court and communicated by Petitioner's counsel. As the Court previously explained, it is these lies that necessitate the Court's finding that all of Petitioner's testimony in this matter must be discredited.

## DISCUSSION

### A.    Petitioner Has Established a *Prima Facie* Case for Repatriation of BFS

As the Court earlier described, under ICARA, the party petitioning for the child's return bears the burden of establishing by a preponderance of the evidence that the child was wrongfully removed or retained, 22 U.S.C. § 9003(e)(1), *i.e.*, (i) "the child was habitually resident in one State and has been removed to or retained in a different State"; (ii) "the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence"; and (iii) "the petitioner was exercising those rights at the time of the removal or retention." *Gitter*, 396 F.3d at 130-31. Here, the parties have stipulated to the following facts:

- "On March 14, 2022, BFS's country of 'habitual residence' was Poland as used within the context of the [] Convention."

- "On March 14, 2022, Petitioner [] had rights of custody as defined by Article 5 of the [] Convention."

- "On March 14, 2022, Petitioner [] would have been exercising his rights of custody pursuant to

> > > Article 3(b) of the [] Convention if not for the
> > > retention of BFS."

> > ▪ "The retention of BFS on March 14, 2022 was
> > wrongful pursuant to Article 3 of the Hague
> > Abduction Convention."

(Dkt. #80 (parties' joint pretrial proposed order) at 5). Accordingly, the Court

finds that Petitioner has established a *prima facie* case for the repatriation of

BFS under the Convention.

## B.    Respondent Has Sufficiently Invoked the Grave Risk Defense

As the Court previously explained, even where a petitioner has

established a *prima facie* case for the repatriation of an abducted child, Article

13(b) of the Convention relieves a court from the obligation to order repatriation

where "there is a grave risk that ... return would expose the child to physical or

psychological harm or otherwise place the child in an intolerable situation."

Hague Convention, art. 13(b). Pursuant to ICARA, to invoke the so-called

"grave risk exception" or "grave risk defense," a responding parent must

establish by "clear and convincing evidence" that such a risk exists. 22 U.S.C.

§ 9003(e)(2)(A). Determination of whether a respondent has made this showing

is "fact-intensive," and courts in this Circuit are advised to interpret the grave

risk exception "narrowly, lest it swallow the rule." *Souratgar* v. *Lee*, 720 F.3d

96, 103-104 (2d Cir. 2013).

To qualify as a "grave risk of harm" for the purposes of Article 13(b), "the

potential harm to the child must be severe." *Swett*, 2024 WL 2034713, at *41

(quoting *Souratgar*, 720 F.3d at 103) (alterations adopted). In this Circuit, the

kinds of situations that constitute a grave risk of harm are those in which "the

child faces a real risk of being hurt, physically or psychologically, as a result of repatriation," as opposed to those in which "repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences[.]" *Blondin* v. *Dubois*, 238 F.3d 153, 162 (2d Cir. 2001). Further, whether a grave risk of harm exists depends "not only [on] the magnitude of the potential harm but also the probability that the harm will materialize." *Souratgar*, 720 F.3d at 103 (citing *Van De Sande* v. *Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005)).

Below, the Court discusses whether Respondent has shown, by clear and convincing evidence, that the repatriation of BFS poses a grave risk of harm to BFS under Article 13(b), on account of both Petitioner's history of abuse and BFS's potential loss of access to certain developmental programming. The Court then examines whether there are any ameliorative measures that may reduce whatever risk is associated with BFS's hypothetical return to Poland, such that it would nonetheless be appropriate for the Court to order BFS's repatriation. Ultimately, the Court finds that the repatriation of BFS poses a grave risk of harm to BFS, and that ameliorative measures available in Poland cannot sufficiently reduce that risk.

### 1. Repatriation Poses a Grave Risk of Harm to BFS

Relevant to the instant dispute, courts in this Circuit (and others) have routinely found that circumstances involving domestic violence and abuse present a grave risk of harm to an abducted child. *See, e.g.*, *Ermini* v. *Vittori*, 758 F.3d 153, 165 (2d Cir. 2014) (finding grave risk of harm where "[the

respondent] was repeatedly struck; as were the children, whom [the petitioner] was 'in the habit' of hitting," and one child testified to "being fearful of [the petitioner] on the basis of this physical and verbal abuse"); *Simcox* v. *Simcox*, 511 F.3d 594, 608 (6th Cir. 2007) (finding grave risk of harm where the petitioner subjected children to "repeated beatings, hair pulling, ear pulling, and belt-whipping," as well as psychological abuse); *Walsh* v. *Walsh*, 221 F.3d 204, 221 (1st Cir. 2000) (finding grave risk of harm where petitioner had abused respondent and "was harsh with the[ir] son, including pinching his legs so hard as to leave bruises and other forms of abuse").

Furthermore, it is well settled in this Circuit that evidence of prior spousal abuse *alone*, even if not directed at the child, can support invocation of the grave risk defense. *See Rial* v. *Rijo*, No. 10 Civ. 1578 (RJH), 2010 WL 1643995, at *2 (S.D.N.Y. Apr. 23, 2010). Where evidence of spousal abuse has sufficed to show a grave risk of harm, such abuse is generally serious, recurring, and (at times) perpetrated in the presence of the child. *Laguna* v. *Avila*, No. 07 Civ. 5136 (ENV), 2008 WL 1986253, at *8-9 (E.D.N.Y. May 7, 2008) ("Evidence of sporadic or isolated incidents of abuse, or of some limited incidents aimed at persons other than the child at issue, have not been found sufficient to support application of the 'grave risk' exception."). *Compare In re D.T.J.*, 956 F. Supp. 2d 523, 546-547 (S.D.N.Y. 2013) (finding grave risk of harm where child "was never physically assaulted by [petitioner]," but was privy to numerous instances of petitioner's abuse of her mother), *and Elyashiv* v. *Elyashiv*, 353 F. Supp. 2d 394, 409 (E.D.N.Y. 2005) (finding grave risk of

44

harm due to, *inter alia*, petitioner's "inability to control his temper," and "pattern of domestic abuse," though petitioner had never physically abused child), *with In re Filipczak*, 838 F. Supp. 2d 174, 180 (S.D.N.Y. 2011) (granting repatriation petition even though child had witnessed one incident of spousal abuse as a two-year-old), *and Rial*, 2010 WL 1643995, at *2-3 (ordering return of child despite evidence that petitioner was verbally and sometimes physically abusive to respondent, and that child was "present for at least some of this abuse"), *and Lachhman* v. *Lachhman*, No. 08 Civ. 4363 (CPS), 2008 WL 5054198, at *9 (E.D.N.Y. Nov. 21, 2008) (concluding that evidence of petitioner's previous arrest, but not conviction, on domestic abuse charges was insufficient to establish grave risk where there was no evidence that petitioner had ever harmed child).

Turning to the facts of this case, Petitioner's abuse of Respondent compels a finding that BFS is at grave risk of harm, as do the facts that BFS has been, and would be, exposed to that abuse. As the Court detailed in its Findings of Fact, Petitioner's history of difficulty with impulse control, predilection to intense fits of anger, and physical and psychological abuse of Respondent — often in the presence of BFS — is thoroughly supported by the record. So too is Petitioner's psychological and, at times, physical abuse of BFS himself. Accordingly, the Court finds that Respondent has sufficiently invoked the grave risk defense. *See, e.g.*, *Davies* v. *Davies*, 717 F. App'x 43, 48-49 (2d Cir. 2017) (summary order) (affirming grave risk determination "premised on overwhelming evidence of [petitioner]'s extreme violence and

45

uncontrollable anger, as well as his psychological abuse of [respondent] over many years, much of which was witnessed by [the child], and the fact that [petitioner] frequently screamed and yelled at [the child] for no legitimate reason").

The finding in *Davies* v. *Davies* is illuminative, wherein the Second Circuit affirmed the trial court's grave risk determination. *See Davies* v. *Davies*, No. 16 Civ. 6542 (VB), 2017 WL 361556, at *2 (S.D.N.Y. Jan. 25, 2017). In that case, the record demonstrated that the petitioner was quick to anger at even the slightest of inconveniences, such as when the respondent "didn't do the dishes or if the bedroom was messy or if there were clothes on the floor." *Id.* In those instances, the petitioner would scream in the respondent's face and slam and punch doors. *Id.* at *2-3. The record also supported the fact that the couple's child had been a frequent witness to the petitioner's abuse of the respondent, and that, in some instances, the petitioner had screamed at the child himself. *Davies*, 717 F. App'x at 47-48 ("[The petitioner]'s sustained pattern of abusing [the respondent] in [the child]'s presence included, among other things: yelling at her and pushing her out of the way while [the child] stood by; ripping [the child] out of her arms; and screaming in her face because [the child] wanted to sleep with her."). And while the petitioner had never punched or beaten the respondent, *Davies*, 2017 WL 361556, at *11, he did exhibit violence towards others, including animals, *id.* at *6. On that record, the Second Circuit affirmed a finding of grave risk in a summary order.

The petitioner in *Davies* and Petitioner in this case exhibited remarkably similar behavior patterns.  Indeed, the record shows that Petitioner's violent behavior — which included pushing, grabbing, kicking, and hitting Respondent — exceeds that found in *Davies*.  The record in this case also features a number of additional aggravating factors not present in *Davies*, namely, the few isolated instances of Petitioner's physical abuse of BFS, as well as Petitioner's well-established criminal history of obsessively targeting former romantic partners.  Accordingly, the Court finds that the repatriation of BFS to Poland would expose him to a real risk of both psychological and physical harm, and as such is inappropriate.

The Court's analysis of the harm posed by repatriation of BFS does not end there, however.  Importantly, in 2014, the Second Circuit acknowledged that a grave risk of harm — and specifically, psychological harm — can exist where an abducted child with a cognitive disability has been enrolled in specific developmental programming in his new country and removing him from that programming would result in "a severe loss of the skills that he had successfully developed." *Ermini*, 758 F.3d at 166.  In that decision, facing for the first time the question of whether "this kind of psychological harm" fell within the scope of Article 13(b), the Second Circuit answered in the affirmative.  *Id.*  The Second Circuit further noted that "sister signatories [to the Hague Convention] have found the risk of harm … to be sufficiently grave" in similar circumstances.  *Id.* at 166-67 (first citing *J.M.H.* v. *A.S.*, [2010] 367 N.B.R. 2d 200 (N.B. Fam. Ct.) (Can.) (concluding that risk to wellbeing of child

47

who exhibited signs of autism in removing child from treatment was sufficiently grave); and then citing *DP Commonwealth Cent. Auth.*, [2001] HCA 39 (High Ct. Austl.) (finding that lack of adequate treatment facilities for child with autism in his country of habitual residence was appropriate reason for refusing to return the child)).

Here, as the Court detailed in its Findings of Fact, BFS has general developmental delays (Resp. Decl. ¶ 166), for which he receives extensive therapy, including special education services (*see, e.g.*, Ex. R-39) and speech-language therapy (*see, e.g.*, Ex. R-40).  Moreover, since arriving in the United States, there has been a meaningful improvement in BFS's "emotional, intellectual, [and] motor skills," *inter alia.*  (Tr. 111:13-21 (Testimony of Resp.)). Furthermore, as Dr. Fernandez opined, "[a]ny disruption to [this programming] would risk the development of mental health symptoms [] such as anxiety and depression," which "could disrupt [BFS's] progress."  (E. Fernandez Rep. 18). While the Court does not opine herein on whether BFS's loss of access to the services he currently receives would, in and of itself, constitute a grave risk of harm upon which the Article 13(b) exception may be invoked, the Court does find that such loss supports the Court's overall finding herein that repatriation poses a grave risk of harm to BFS.

### 2. Ameliorative Measures Available in Poland Are Not Sufficient to Protect BFS

Before it can conclude that Respondent has sufficiently invoked the grave risk defense, the Court must "take into account any ameliorative measures (by the parents and by the authorities of the state having jurisdiction over the

question of custody [Poland]) that can reduce whatever risk might otherwise be associated with [BFS]'s repatriation." *Blondin*, 189 F.3d at 248; *see also Golan*, 596 U.S. at 682 ("[A] district court must exercise its discretion to consider ameliorative measures in a manner consistent with its general obligation to address the parties' substantive arguments and its specific obligations under the Convention."). In doing so, the Court is guided by the *Blondin* Court's instruction:

> In the exercise of comity that is at the heart of the Convention (an international agreement, we recall, that is an integral part of the "supreme Law of the Land," U.S. Const., art. VI), we are required to place our trust in the court of the home country to issue whatever orders may be necessary to safeguard children who come before it.

*Blondin*, 189 F.3d at 248.

During the course of these proceedings, the Court heard extensive testimony regarding the Polish legal system and its ability to combat domestic abuse. Petitioner's expert, Anna Lesiak-Grzywińska, opined on the various measures available to victims of domestic violence under Polish law, including, but not limited to:

- "Provi[sion] … of psychological, medical, legal, and social advice";

- "Protection from further harm by preventing the person using domestic violence from sharing a flat with the person experiencing domestic violence and prohibiting contacting and approaching the person experiencing domestic violence";

- "Provi[sion] [of] free assistance in the form of safe shelter at a specialist support center for victims of domestic violence";

- ▪ "Provi[sion] [of] access to a free medical examination to determine the causes and type of bodily injury in relation to domestic violence [and] issu[ance] [of] a free medical certificate specifying the causes and type of bodily injury in relation to violence";

- ▪ "Provi[sion,] [to] a person suffering from domestic violence, who does not have a legal title to a flat occupied jointly with a person using domestic violence, [of] assistance in obtaining a flat;"

- ▪ "Prohibit[ion] [of] the violent person from contacting and approaching the victim"; and

- ▪ The "main tool," the so-called "Blue Cards" procedure, which "includes any and all activities undertaken by representatives of the social care organizational units, borough commissions for solving alcohol problems, the Police, and educational and healthcare institutions whenever reasonable suspicion of domestic violence occurs," and is "initiated by completing [a] 'Blue Card' form." (A. Grzywińska Rep. 22-23).

At trial, Respondent's expert, Michal Wochnik, described the shortcomings of this admittedly substantial set of ameliorative measures available under Polish law. Wochnik took issue with Grzywińska's opinion that Polish authorities provide immediate orders of protection to victims of domestic abuse, describing it as "pure theory," and claiming that the laws cited by Grzywińska "[were] not practically used." (*See* Tr. 639:24-640:6 (Testimony of M. Wochnik) ("[W]ith respect to the order to be issued by the policeman being on the intervention at house, it is normal practice that the police take note of whatever happened instead of issuing immediate order.")). Wochnik further articulated the very limited sanctions available for breaches of these orders — *e.g.*, brief incarceration of less than a month, small fines of under $1,100,

community service, or restrictions on changing residences (*see id.* at 649:20–654:11) — and described the idea that they could protect the person relying on them as "like [] science fiction" (*see id.* at 646:16-648:15).

Even more troublingly, Wochnik referred the Court to a report by the independent non-governmental organization Court Watch Poland, which, after surveying public opinion, reviewing hundreds of case files, and observing hundreds of hearings, as well as conducting interviews with professionals who deal with incidents of domestic violence, concluded that:

> Cases of domestic violence in Poland are being treated routinely by relevant institutions; lack of adequate understanding of the problem often results in secondary victimization and hampers efforts at preventing further violence.

(Ex. R-96 at 107). Further,

> In 1 in 5 of the cases [] analyzed minor children were not treated as victims of domestic violence even though they lived with the victim and/or the perpetrator. Violence [by] adults against children is largely invisible to state institutions and the justice system in Poland.

(*Id.* at 108).

Grzywińska, to her credit, acknowledged during trial certain issues with the Polish system. Among other things, she conceded that, in Poland, proceedings concerning allegations of domestic violence can take "a long time … sometimes several years." (Tr. 614:6-22 (Testimony of A. Grzywińska)). She further accepted that the Polish system sometimes fails victims of domestic abuse (*see id.* at 615:9-19), and that domestic violence and abuse can continue even with certain protective measures in place (*see id.* at 620:12-19).

Collectively, the parties' experts painted a picture of a substantial, multifaceted system of protections for victims of domestic violence in Poland, albeit one that, in practice, operates slowly and inefficiently and bears substantial blind spots, particularly when it comes to the protection of minor children. This finding alone leaves the Court uncertain that the Polish justice system could eliminate the grave risk of harm posed to BFS by repatriation.

Critically, however, there are a number of additional circumstances in this case that leave the Court entirely convinced that any ameliorative measures available in Poland, notwithstanding their efficacy, would be insufficient to insulate BFS from a grave risk of harm. *First*, the Court underscores Petitioner's history of violating Court orders, and protective orders in particular. The Court has already detailed Petitioner's substantial noncompliance with the orders of this and other courts throughout this Opinion, but highlights several particularly relevant violations here:

- In late 2011 and early 2012, Petitioner failed to abide by a protective order put in place by a California state court seeking to prevent his harassment of the California victim by inappropriately calling and texting the victim on numerous occasions. (*See generally* Ex. R-48, 49, 51, and 55 (California criminal records and associated orders)).

- As described in the above Findings of Fact, Petitioner has breached multiple French court orders concerning both his probation and his conditional release in France; indeed, he re-commenced his harassment of the California victim in France on the day he was released from prison after serving a jail sentence for forging judicial documents to attempt to locate her. (*See generally* Dkt. #120-1, 16-17, 19).

- ▪ Petitioner disobeyed this Court's orders regarding his communications with Respondent *during the trial in this matter*. That is, after the Court made clear that the Petitioner should cease communications with Respondent outside of his Court-mandated calls with BFS (*see* Tr. 366:7-16 (testimony of Petitioner's counsel)), Petitioner bombarded Respondent with messages by WhatsApp and Facebook, accusing her of abusing and manipulating BFS (*see id.* at 559:1-569:18).

The Court thus finds that Petitioner is unlikely to abide by any protective order put in place by a Polish court upon BFS's repatriation, rendering the salutary effect of such a measure dubious for the purposes of the grave risk analysis. *See also Walsh*, 221 F.3d at 221 (holding that although the court had "no doubt that [courts of the home country] would issue appropriate protective orders," repatriation was denied in part because spouse's habitual disobedience of such orders would render them ineffective).

*Second*, the Court emphasizes Petitioner's total unwillingness to accept any responsibility for his actions and his lack of understanding of (or reflection on) the same. Petitioner himself described this case as a "domestic violence fairy tale." (Pet. Decl. ¶ 79; *see generally* Pet. FFCL (Pre) ("There have been no incidents of domestic violence perpetrated by Petitioner upon Respondent, in the presence of BFS or otherwise.")). At trial, Petitioner largely denied having any role in his and Respondent's marital issues: for instance, he testified that he never started an argument with Respondent after the birth of BFS (a period of almost three years before Respondent fled to the United States). (*See* Tr. 340:9-18 (Testimony of Pet.)). Moreover, when Petitioner did admit that

53

some incident described by Respondent or Respondent's witnesses had occurred in at least some respect, Petitioner sought to downplay what had happened or to justify his actions, or proceeded to give unresponsive testimony instead.  (*See id.* at 342:4-343:6 (Testimony of Pet.) (proceeding to tell a story about a different dog when asked about the incident in which he yelled at Respondent's mother for feeding the parties' dogs)).

Because Petitioner refuses to accept fault or responsibility for his actions, the Court is doubtful that any therapeutic interventions available in Poland would deter Petitioner from continued abuse or reduce the potential harm to BFS posed by repatriation.  *See Morales* v. *Sarmiento*, No. 23 Civ. 281 (KPE), 2023 WL 3886075, at *13 (S.D. Tex. June 8, 2023) (finding ameliorative measures insufficient where the petitioner "expressed neither remorse nor reflection about his actions").  (*See also* Tr. 699:2-18 (Testimony of E. Fernandez) ("[I]f the person that's being accused of or perpetrating some form of violence ... [has] no insight about what they're contributing to th[e] experience, the prognosis for interventions ... say, for example, a psychotherapeutic intervention to occur is very minimal.")).  For this reason, and those previously stated, the Court finds that any ameliorative measures available in Poland cannot sufficiently reduce the grave risk of harm BFS faces if he were to be repatriated to Poland.

## CONCLUSION

For the reasons stated above, the Court DENIES the Petition, finding that repatriation of BFS to Poland would expose him to a grave risk of harm

pursuant to Article 13(b) of the Hague Convention.  Accordingly, the Court declines to enter an order commanding the same.  Because the Court declines to enter an Order of Return, it also declines to address whether Respondent and BFS's ongoing asylum application requires the staying of such an order until BFS's asylum application has been determined.

As the Court was preparing these Findings of Fact and Conclusions of Law, it learned of several troubling developments in the relationships among the parties.  (*See, e.g.*, Dkt. #152, 154 (requests for Court intervention authorizing video calls between Petitioner and BFS); Dkt. #164 (Petitioner's request to reopen hearing based on new information)).  Among other things, the Court learned that Respondent has recently experienced problems with alcohol abuse and mental health issues, and that BFS was very recently removed from her custody and placed in temporary foster care (with a third party known to Respondent and BFS) by the New York City Administration for Children's Services ("ACS").  (Dkt. #164, 165).  Petitioner has sought to reopen the instant proceedings to develop a record on these issues, and Respondent has opposed any such reopening.  (*Id.*).  While the Court is appropriately concerned about BFS's safety and security, it has elected not to reopen the record, but rather to issue its decision at the earliest possible opportunity, in order to allow other proceedings in New York and Poland that are more directly concerned with the custody and supervision of BFS to proceed.[5]

---

[5]    Given this resolution, the Court is specifically not making a credibility determination as to Respondent's sister, Ewa Sokola ("E. Sokola"), who submitted a declaration in

The Court recognizes the narrowness of the lane in which it operates.  It was asked to determine, and it has determined, whether BFS was wrongfully removed from his State of habitual residence, and whether there was an affirmative defense that justified BFS's removal by Respondent.  On the record before the Court, which includes the most recent filings (*see generally* Dkt. #150-166), it has answered both questions in the affirmative.  Whatever the nature of Respondent's current problems, they do not change the extensive record of Petitioner's tendencies toward physical and psychological abuse, including abuse of BFS.  And while Respondent has been making efforts to address her issues, there is no evidence that Petitioner has made comparable efforts to address his own.  To the contrary, the Court understands that Petitioner has expanded the victims of his current threats to include not only Respondent and BFS, but now the foster carer in whose care BFS has been placed.  In short, the new information does nothing to alter the Court's Hague Convention analysis.

The Clerk of Court is directed to terminate all outstanding motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:    September 17, 2024
          New York, New York

_____
    KATHERINE POLK FAILLA
    United States District Judge

---

support of Petitioner (Dkt. #164 at 6-11), after E. Sokola's son was arrested for assaulting Respondent in the latter's home (Dkt. #165 at 1).